**Roger W. GIESE, Plaintiff,**

v.

**PIERCE CHEMICAL COMPANY and Vector Laboratories, Inc., Defendants.**

Nos. Civ.A. 97–12561–WGY, Civ.A. 97–12562–WGY.

United States District Court, D. Massachusetts.

March 5, 1999.

Ian Crawford, J. Owen Todd, Todd & Weld, Boston, MA, for Roger W. Giese, plaintiff.

Peter G. Carroll, Medlen & Carroll, LLP, Cambridge, MA, Duane C. Blake, Medlen & Carroll, LLP, Cambridge, MA, for Vector Laboratories, Inc., defendant.

Peter G. Carroll, Medlen & Carroll, LLP, Cambridge, MA, Thomas Currier, Rockford, IL, for Pierce Chemical Company, defendant.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

### I. Introduction

The plaintiff in this action, Roger W. Giese ("Giese"), commenced suit against the defendants, Vector Laboratories, Inc. and Pierce Chemical Co. (collectively, "Vector"), alleging contributory infringement and inducement of infringement of Giese's patents, United States Letters Patent Nos. Re. 31,712 ("the '712 Patent") and B1, 4,478,914 ("the '914 Patent").

The patents cover a method by which multiple layers of chemicals are attached to one another to form a stable system. The resulting system typically is used to improve detection of certain types of cells, such as cancer cells. Under an assignment of rights to United States Letters Patent No. 4,684,609 ("the '609 Patent"), Vector manufactures a kit of chemical reagents marketed under the trade name "Vectastain ABC Kit" ("Vectastain Kit"), a product designed to assist in the marking and detection of various types of cells.

Pierce Chemical Company purchases the Vectastain Kits for subsequent resale. Giese maintains in his Amended Complaint that the Vectastain Kits "incorporate the technology discovered by Plaintiff." Amend. Compl. ¶ 9. Giese further alleges that the defendants use "a component of Dr. Giese's patented technology in its ABC Staining Kits which component constitutes a material part of Dr. Giese's invention." *Id.* at ¶ 15. On the strength of these allegations, Giese contends that Vector has contributed to or has actively induced the direct infringement of the patents. Giese includes no count for direct infringement.

Vector comes now before this Court with six separate motions for partial summary judgment. The first seeks summary judgment that independent and dependent claims within the '914 Patent are invalid because such claims were impermissibly broadened during reexamination. The second seeks summary judgment that Vector's "preformed complex" is not a "layered structure" or "monomolecular" as those terms are set forth in Giese's patent claims. The third seeks summary judgment to eliminate lost profits and future royalties as bases for determining damages. The fourth seeks summary judgment denying recovery for infringement of the '914 Patent claims under the doctrine of intervening rights. The fifth seeks summary judgment on the ground that Giese made material omissions of prior art during the prosecution of the '914 and '712 Patents. Finally, the sixth motion seeks summary judgment as to the validity of '609 Patent.

### II. Summary Judgment Standard

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as matter of law. *See London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1537–38 (Fed.Cir.1991). A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of the non-moving party. *See Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When deciding a summary judgment motion, a court must view the evidence presented in the light most favorable to the non-moving party and resolve all doubts in its favor. *See Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.,* 149 F.3d 1309, 1315 (Fed.Cir.1998).

### III. Motion for Partial Summary Judgment Based on Purported Enlargement During Reexamination

In its first motion for partial summary judgment, Vector argues that Claims 25–27 and 43–73 of Giese's '914 Patent are invalid because they are the result of impermissible "enlargement" during reexamination by the Patent and Trademark Office (the "Patent Office"). The gravamen of Vector's argument is that, as reexamined, Claim 25 of the '914 Patent omits a "washing" step that was featured in Claim 25 of the original '914 Patent. Since Claims 26–27 and 43–73 are dependent upon Claim 25, Vector seeks simultaneously to invalidate these thirty-three claims. Giese, on the other hand, argues that the "washing" step actually was optional in the original '914 Patent. Furthermore, Giese asserts that, while omitted from Claim 25, the "washing" step was actually maintained during reexamination and now appears in Claim 54 of the Reexamination Certificate.

#### A. Relevant Facts

On October 23, 1984 the Patent Office issued the '914 Patent (the "Original '914 Patent") to Giese. *See* Giese Dec., Ex. 3. In the Original '914 Patent, Claim 25 provides:

A process of modifying the surface properties of a material, which process comprises: (a) applying alternate successive layers of a first or second material to the surface to be modified ... (b) *washing the surface between each applying step to remove unreacted first or second*

*material;* and (c) recovering a multiple layer material whose surface is modified. *Id.* (emphasis added). In the "Summary of the Invention," however, the Original '914 Patent states:

[L]ayers ... are built up on a surface, but the process *may be relaxed by omitting washing steps,* thereby possibly mixing in coverage with multimolecular or multiparticulate species.

*Id.* (emphasis added).

On May 11, 1995, Giese submitted the Original '914 Patent to the Patent Office for reexamination in light of additional "prior art" that had recently been brought to his attention. *See id.* at ¶ 8. On June 17, 1997, after several rejections by the Examiner, the Patent Office issued Reexamination Certificate B1, 4,478,914 (the "Reexamined '914 Patent"). *See id.* at Ex. 4. Claim 25 of the Reexamined '914 Patent omits the phrase "washing the surface between each applying step to remove unreacted first or second material." *See id.* Claim 54, an "addition" made to the patent, provides:

The process of claim 25 *which includes washing the surface* between applying successive layers of the first and second materials.

*Id.* (emphasis added). Claims 26–27 are dependent upon Claim 25 and were included in the Original '914 Patent. *See id.* at Ex. Claims 43–73 are also dependent upon Claim 25 but were included as "additions" during the Reexamination. *See id.* at Ex. 4.

#### B. Doctrine of Impermissible Enlargement

 Under 35 U.S.C. § 305, "[n]o proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding under this chapter." A claim is impermissibly enlarged during reexamination "if it includes within its scope any subject matter that would not have infringed the original patent." *Quantum Corp. v. Rodime, PLC,* 65 F.3d 1577, 1580 (Fed.Cir.1995).

A finding of impermissible enlargement renders the claim entirely invalid—the original scope of the claims *does not* remain available to the patentee. *See id.* at 1584.

 The determination whether claims have been impermissibly enlarged is a matter of claim construction and is treated as a question of law. *See In re Freeman,* 30 F.3d 1459, 1464 (Fed.Cir. 1994). When construing the meaning of disputed terms in a claim, courts should look first to the intrinsic evidence of the record. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir. 1996). Words in a claim generally are given their ordinary and customary meaning, unless the patentee has specified otherwise in the patent specification or prosecution history. *See id.* If in evidence, courts may consider the prosecution history of the patent. *See id.* Courts should only consider extrinsic evidence, such as dictionaries, scientific publications, and expert testimony, when the intrinsic evidence is ambiguous. *See id.* at 1583.

## C. Construing Claim 25

 Claim 25 of Giese's Original '914 patent could not be more straightfor-

ward—"washing the surface between each applying step to remove unreacted first or second material" is unquestionably an element of the claim. Giese Dec., Ex. 3. Furthermore, Giese cannot transform this required "washing" step into an "optional" one by relying on language in the "Summary of the Invention." As an initial matter, the "Summary of the Invention" is often considered part of the specification. *See, e.g., Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 617 (Fed.Cir.1995). Limitations that appear only in the specification may not be read into patent claims. *See Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1054 (Fed.Cir.1994).

 Even if this Court were to consider the "Summary of the Invention" separate from the patent "specification," Giese's argument is nonetheless unpersuasive in light of a recent Federal Circuit opinion that rejected a strikingly similar attempt to use words in the "Summary of the Invention" to contradict the unambiguous language of a disputed claim. In *Armament Systems and Procedures, Inc. v. Monadnock Lifetime Products, Inc.,* 1998 WL 537746 (Fed.Cir. Aug. 7, 1998) (unpublished),[1] the defendant argued that a claim

---

1. This Court recognizes that *Armament Systems* is an unpublished opinion and is "not citable as precedent" under Fed.Cir.Loc.R. 47.6(b). This hardly means, however, that it cannot be cited at all. The Federal Circuit, like the other circuits, not infrequently issues opinions that are officially deemed "unpublished." *See* Kirt Shuldberg, Comment, Digital Influence: Technology and Unpublished Opinions in the Federal Courts of Appeals, 85 Calif.L.Rev. 541, 545–547 (1997) (describing development of circuit rules to limit publication of opinions following 1972 recommendation by the Judicial Conference of the United States). The nationwide proliferation of this body of "unpublished" opinions—which are, in fact, promptly published in West's national reporters and other legal publications—is both confusing and troubling. It becomes all the more troubling in those circuits which disallow or severely restrict citation of "unpublished" opinions, *see* 1st Cir.Loc.R. 36.2(b)(6) (citation only in related cases); 7th Cir.Loc.R. 53(b)(2)(iv) (citation only for bind-

ing or preclusive effect); 9th Cir.Loc.R. 36–3 (same); D.C.Cir.Loc.R. 28(c) (same); Fed.Cir. Loc.R. 47.6(b) (same), especially when one of the taboo opinions turns out to be highly relevant to a case at bar.

There is sound reasoning behind the practice, however. As recently explained to the judges within the First Circuit by the Hon. Bruce Selya, in these days of already crowded federal appellate dockets burgeoning with ever more cases each month, there is sometimes a need, due to the presentation of unique factual circumstances or inartful briefing, to resolve an appeal without creating a precedent that would bind later panels of the same court. Hence the "unpublished" opinion "not citable as precedent." Informal remarks of Bruce Selya at the First Circuit Judicial Conference, Oct. 28, 1998 (unpublished); *see also* Shuldberg, 85 Calif.L.Rev. at 547–551 (describing historical justifications for practice of restricting citation of unpublished opinions). At the same time, these decisions represent the considered opinions of

should be construed to include a four-step process described in the Summary of the Invention even though the claim itself described only two steps. *See id.* at *2. Holding that "the language of the claim frames and ultimately resolves all issues of claim interpretation," the Federal Circuit refused to " 'interpret' the claim in the manner suggested.... " *Id.* In the present case, the inclusive three-step process described in Claim 25 of the Original '914 Patent, rather than Giese's "optional" interpretation derived from the Summary of the Invention, "frames and ultimately resolves all issues of claim interpretation." As issued, Claim 25 of the Original '914 Patent required the "washing" step.

■ Considered under the *Quantum Corp.* standard, the omission of the "washing" step from Claim 25 of the Reexamined '914 Patent impermissibly broadens the scope of Claim 25 of the Original '914 Patent. A process patent is not infringed when any of the steps which constitute the patented method or process is omitted.[2] *See, e.g., Nationwide Chem. Corp. v. Wright,* 584 F.2d 714, 717 (5th Cir.1978) (holding that insecticide process requiring application only to plant did not infringe patent which required plant and soil application). Since a two-step process that modifies the surface properties of a mate-

rial without a "washing" step would thus "not have infringed the original patent," *Quantum Corp.,* 65 F.3d at 1580, Claim 25 of the Reexamined '914 Patent goes too far.

■ As a final matter, Giese argues that the removal of the "washing" step from Claim 25 of the Reexamined '914 Patent is not truly an omission because the "optional washing step is reflected in dependent claim 54 of the reexamined patent.... " Pl.Opp.Mem. at 10. While Claim 54 does refer to the "washing" step, "the additional limitations of a dependent claim must not be read or implied into an independent claim if said independent claim does not contain the same limitation." *Pave Tech, Inc. v. Snap Edge Corp.,* 952 F.Supp. 1284, 1295 (N.D.Ill.1997). In other words, moving the "washing" step to Claim 54 does not save Giese because "[t]he dependent claim tail cannot wag the independent claim dog." *North American Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1577 (Fed.Cir.1993). Consequently, this Court GRANTS summary judgment invalidating Claim 25 of the Reexamined '914 Patent. Such ruling simultaneously invalidates Claim 25 of the Original '914 Patent. *See Quantum Corp.,* 65 F.3d at 1584.

sitting judges deciding actual cases so it is little wonder that the legal reporting services disseminate them and members of the bar read them. Moreover, where, as here, a body of law falls under the exclusive jurisdiction of only one federal circuit, the incremental worth of any opinion—even one expressly designated as "unpublished"—is enhanced.

What, then, are the bar and the district courts to do? Quite simply, take the circuit rules at their word and, when an "unpublished opinion" is persuasive, go ahead and cite it—noting its unpublished status and providing copies to the court and opposing counsel—not as precedent but as one would cite a law review article by three respected authors. Many circuits have already adopted this approach explicitly. *See* 5th Cir.Loc.R. 47.5.4; 8th Cir.Loc.R. 28A(k); 10th Cir.Loc.R. 36.3; 11th Cir.Loc.R. 36–2 (each affording persuasive authority to unpublished opinions); *cf.* 4th Cir.Loc.R. 36(c); 6th Cir.Loc.R. 24(c)

(both allowing unpublished opinions to be cited as precedent in certain circumstances). When a district court chooses to follow an unpublished opinion, it further explicates its own analysis—always a desirable result—by reference to legal reasoning it considers persuasive albeit not binding. That is what the Court has done here.

2. A process patent may be infringed despite the elimination of an important step in certain limited circumstances. Under the doctrine of equivalents, "a product or process that does not literally infringe ... the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Unidynamics Corp. v. Automatic Prod. Int'l, Ltd.,* 157 F.3d 1311, 1322 (Fed.Cir.1998). The doctrine of equivalents, however, has not been raised by the parties in this case.

## D. Dependent Claims

Under 35 U.S.C. § 282,

 patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.... The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

Although this statutory mandate can be applied to a typical patent claim without difficulty, applying it to claims added during reexamination that are dependent upon an impermissibly broadened claim and to those that existed before reexamination becomes troublesome.

 As explained in this section, the demise of Claim 25 in the Reexamined '914 Patent sounds the death knell for Claim 27 and Claims 43–73. The only claim that may survive the impermissible broadening is Claim 26, for reasons discussed below.[3]

### 1. Claim 27

 Despite the section 282 presumption, the invalidity of Claim 25 forces this Court to strike Claim 27 because it merely claims "[t]he multiple layer system produced by the process of claim 25." Giese Dec., Ex. 3. The Supreme Court has held that a product patent can be sustained independently of a process patent only if "sufficiently described." *Holland Furniture Co. v. Perkins Glue Co.*, 277 U.S. 245, 254, 48 S.Ct. 474, 72 L.Ed. 868 (1928). A product patent is not "sufficiently described," however, if defined only by reference to another claim. *See Downes v.*

*Teter–Heany Dev. Co.*, 150 F. 122, 123–124 (3rd Cir.1907); *cf. Triplex Safety Glass Co. v. Duplate Corp.*, 42 F.2d 737, 738–739 (W.D.Pa.1929) (distinguishing *Downes* because product claim was described without reference to the corresponding process claim). Furthermore, "[w]hen a process and a product are identical and the former creates the latter, there is but a single invention." *Equitable Paper Bag Co. v. Coe*, 70 F.2d 735, 736 (D.C.Cir.1934). Since the multiple layer *product* of Claim 27 is described only by reference to the now invalid three layer *process* of Claim 25, this Court holds Claim 27 invalid as matter of law and GRANTS Vector's motion for partial summary judgment.

### 2. Claims 43–73

 As stated above, courts penalize patentees who violate 35 U.S.C. § 305 by attempting to enlarge their patent claims during reexamination with the invalidation of both the broadened *and* the original claim. *See Quantum Corp.*, 65 F.3d at 1584. This Court thus cannot read 35 U.S.C. § 282 to allow Giese to rely on Claim 25 of the Original '914 Patent as the basis for the newly added dependent claims in the Reexamined '914 Patent. These claims therefore share the same fate as Claim 25 and this Court GRANTS summary judgment invalidating them. *Cf. Thermalloy Inc. v. Aavid Eng'g, Inc.*, 935 F.Supp. 55, 60 (D.N.H.1996) (invalidating as "matter of law" claims added during reexamination without discussing relationship between section 305 and section 282), *aff'd*, 121 F.3d 691 (Fed.Cir.1997).

### 3. Claim 26

 While Giese should lose his monopoly power over Claim 25 for his at-

---

**3.** There is some argument that Claim 54 should survive because it is the functional equivalent of the original, pre-broadening Claim 25. Applying the presumption of validity to Claim 54, however, would have the ridiculous result of reestablishing the original three-step version of Claim 25. Such a result would effectively give individuals a "safe-har-

bor" in which to broaden claims during reexamination. To avoid the penalty of section 305, patentees would merely include an additional dependent claim that states the limitations omitted during reexamination. Thus, Claim 54 must be invalidated to preserve the deterrent effect of section 305.

tempts unfairly to expand it during reexamination, section 282 would be deprived of much of its import were this Court to deny some form of protection to those dependent claims which existed *before* reexamination. Since Claim 26 depended upon Claim 25 of the Original '914 Patent, invalidating it appears to take the section 305 penalty too far. The Court acknowledges that the Federal Circuit has, without discussion, invalidated dependent claims that predate the impermissible broadening of corresponding independent claims. *See Thermalloy*, 121 F.3d at 693–694; *Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 828 (Fed.Cir.1984); *Anderson v. Int'l Eng'g & Mfg., Inc.*, 160 F.3d 1345, 1350 (Fed.Cir. 1998); *Quantum Corp.*, 65 F.3d at 1584. Despite the rule implicit in these cases, this Court concludes that, at the present summary judgment juncture, a more equitable reconciliation of the section 282 presumption of validity and the section 305 penalty for impermissible broadening may be reached by allowing the case to proceed with respect to Claim 26 and then addressing this question anew following the jury verdict.[4]

Accordingly, since Vector has not made an independent demonstration of invalidity with respect to Claim 26 as is required by section 282, this Court presently applies the presumption of validity and DENIES summary judgment as to that claim.

4. Of course, were the Court to allow Claim 26 to survive despite broadening, it would need always to be read against the original Claim 25 rather than the broadened version.

5. Vector also argues in this motion that the "preformed complex" is distinguishable from the monomolecular layering process described in Claim 25 of Giese's '914 Patent. Since the previous section of the Court's opinion holds Claim 25 invalid for impermissible broadening, however, whether the "preformed complex" is distinguishable from the monomolecular layering process of Claim 25 and its dependent claims is moot and will not be addressed. To the extent that Vector also seeks partial summary judgment concerning

## IV. Motion for Partial Summary Judgment Regarding Monomolecular and Layered Nature of Vector's Preformed Complex

▮▮▮▮ In their second motion for partial summary judgment, Vector argues that the "preformed complex" described in its Vectastain Kits is distinguishable from the "layered" and "monomolecular" structure described in Claim 1 of Giese's '712 Patent.[5] Consequently, Vector seeks summary judgment.

### A. Relevant Facts

The instructions to the Vectastain Kits direct users to create a "preformed complex."[6] Blake Dec., Ex. 6. Giese alleges that the Vectastain Kits infringe Claim 1 of his '712 Patent. *See id.*, Ex. 5 at ¶ 10. Claim 1 of the '712 patent requires the step of "applying alternative, *monomolecular*, successive *layers.*" *Id.* at Ex. 2 (emphasis added).

### B. Vector's Argument

To demonstrate that its "preformed complex" is distinguishable from Giese's monomolecular layering process, Vector compares the findings published in a journal article, and restated in an affidavit, by Joseph Madri, Ph.D ("Dr.Madri"), with definitions offered by Giese himself during his deposition in this case. Vector claims that this comparison conclusively demonstrates that the Vectastain Kits' "pre-

Claim 26 of the '914 Patent, the only disputed claim in the '914 Patent not invalidated by impermissible broadening, the following discussion concerning Claim 1 of the '712 Patent is applicable. Claim 26 will not, however, be specifically addressed.

6. The term "preformed complex" does not actually appear in the Vectastain Kits' instructions. Rather, the instructions use the term "Avidin/Biotinylated Enzyme Complex (ABC)." Blake Dec., Ex. 6. Both parties, however, appear to accept the fact that these terms are synonymous. For simplicity's sake, the Court adopts the "preformed complex" terminology.

formed complex" differs from Giese's monomolecular layering process.

In a 1983 article, Dr. Madri describes experiments conducted prior to the instant litigation concerning Vector's "preformed complex." *See* Madri Dec. ¶ 2. Dr. Madri has testified by affidavit that his article "clearly indicates that the [preformed complex] is not one molecule in thickness, as it is a lattice-like structure composed of multiple molecules," *id.* at ¶ 3, and "is not a 'layered' structure," *id.* at ¶ 4.[7]

Since Giese's '712 Patent does not define the terms "monomolecular" and "layer," Vector compares Dr. Madri's findings with definitions provided by Giese during his deposition. In that deposition, Giese stated that a "layer" indicates a "coating," *see* Blake Dec., Ex. 7 at 162, and also acknowledged that the term "monomolecular" is a layer that is one molecule in thickness. *See id.* at 103. Vector, therefore, correctly asserts that Dr. Madri's analysis reveals a stark distinction between Vector's "preformed complex" and the definitions provided by Giese. *See* Def.Mem. at 6–7. Considering these facts, Vector has satisfied its initial burden of demonstrating "an absence of evidence supporting the nonmoving party's case." *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 [1986] ).

## C. Giese's Opposition

Giese does not dispute that Dr. Madri's article distinguishes Vector's "preformed complex" from his monomolecular layering process. Rather, Giese argues that his deposition testimony and Dr. Madri's findings are not the only admissible evidence regarding the similarity of, or differences

between, the Vectastain Kits' "preformed complex" and the monomolecular layering process described in Claim 1 of the '712 Patent. Giese directs the Court to examine three other evidentiary sources to find a disputed genuine issue of material fact: (i) the deposition testimony of Dr. Takeshi Sano ("Dr.Sano"), (ii) the expert report and deposition testimony of Dr. James F. Riordan ("Dr.Riordan"), and (iii) a letter to Vector's president from James M. Heslin ("Attorney Heslin").

### 1. Dr. Sano's Deposition Testimony

Giese relies on the deposition testimony of Dr. Sano, one of Vector's expert witnesses, to establish that the Vectastain Kits' "preformed complex" is not monomolecular and does not involve layering. Both assertions are premised on an "acknowledgment" by Dr. Sano that "one can practice the invention described in Dr. Giese's patent and end up with a lattice-like structure as one of the layers." Pl. Opp.Mem. at 13. This acknowledgment, however, is taken completely out of context—Dr. Sano made clear that Dr. Giese's methodology might make a lattice-like structure if Dr. Giese's layering process was *unsuccessful*. Since this 'premise' is unsubstantiated, it does not support the remainder of Giese's argument. Hence, Giese cannot rely on Dr. Sano's testimony to dispute Dr. Madri's testimony concerning the layered or monomolecular nature of the Vectastain Kits' "preformed complex."

### 2. Dr. Riordan's Report and Deposition Testimony

Giese also submits the report and deposition of Dr. Riordan, one of his expert witnesses, to demonstrate a dispute with

7. Nowhere, however, does the article *explicitly* describe the preformed complex as a "lattice-like structure" or indicate that the preformed complex is not a "layered" structure. Rather, the article describes the preformed complex as "complexes of many biotinylated horseradish peroxidase molecules liked via avidin molecules in three-dimensional ar-

rays." *See* Madri Dec., Tab A at 106. Nevertheless, the absence of any complaint by Giese and the fact that an "array" can be defined as "an arrangement ... in one or several planes," *see* American Heritage Dictionary, 2nd ed. (1985), suggests that "lattice-like structure" and "three-dimensional arrays" are interchangeable terms.

Dr. Madri's testimony.[8] Unquestionably, Dr. Riordan indicates that the Vectastain Kits' preformed complex is a "layering process"—his report unequivocally states that the preformed complex "describes the exact layering process set forth in Dr. Giese's '287 Patent."[9] Mansfield Dec., Ex. 3 at 2. As a result, this Court partially DENIES Vector's motion for summary judgment in that there is a genuine dispute of material fact as to the whether the Vectastain Kits' "preformed complex" is layered.

On the other hand, Giese's argument miscarries when he relies on Dr. Riordan's deposition testimony to dispute Dr. Madri's testimony that the preformed complex is not "monomolecular." Giese points to a statement by Dr. Riordan that the "product" of the preformed complex is a three-layer system of monomolecular layers. *See id.* at Ex. 4, p. 102. When asked directly whether the "preformed complex" itself is a monomolecular layer, however, Dr. Riordan responded that "[i]t is not." *Id.* at 103. Since the preformed complex, and not the *product* of that complex, is the subject of the instant motion for partial summary judgment, Dr. Riordan's testimony does not deviate from that of Dr. Madri—it remains undisputed that the Vectastain Kits' "preformed complex" is *not* monomolecular.

### 3. Letter from Attorney Heslin

As a final attempt to reveal a genuine issue of material fact, Giese offers a September 23, 1981 letter from Attorney Heslin, Vector's attorney, to Dr. James Whitehead ("Whitehead"), Vector's President. Disclosed during discovery, *see id.* at ¶ 3, this letter was apparently sent to Whitehead to advise Vector in formulating its response to Giese's original notification of infringement. *See* Pl.Opp.Mem. at 14. In the letter, Attorney Heslin describes a "method suggested on page 15 of [Vector's] general catalog ... [where] it is suggested that alternate biotin and avidin layers may be applied to a surface...." Mansfield Dec., Ex. 2 at 1. Giese argues that Attorney Heslin's remarks indicate that Vector "did not always describe the technology contained in the staining kits as a 'preformed complex,'" and such earlier representations create a "genuine dispute whether Vector's staining kits are in fact, 'layered' and one molecule in thickness." Pl.Opp.Mem. at 14–15.

Attorney Heslin's letter adds no extra grist to Giese's mill. The description of the "method suggested on page 15" speaks only to the layered nature of the "preformed complex," not its "monomolecular" nature, and Dr. Riordan's report already creates a genuine issue of material fact concerning the layered nature of the Vectastain Kits' "preformed complex." Dr. Madri's article and accompanying affidavit, considered in light of Giese's deposition testimony, leave it undisputed that the Vectastain Kits' "preformed complex" is *not* monomolecular. The Court thus GRANTS partially Vector's motion for summary judgment and rules that the Vectastain Kits' "preformed complex" is not monomolecular.[10]

### V. Motion for Partial Summary Judgment Regarding Lost Profits and Future Royalties as Bases for Determining Damages

Vector seeks summary judgment to remove lost profits as a calculus for determining damages. Giese "acknowledges that the calculation of damages based on lost profits is ... inappropriate in light of the Court's December 2, 1998 decision

8. By Order dated February 17, 1999 this Court denied Vector's motion to exclude partially the opinions of Dr. Riordan.

9. The '712 Patent is the reissued version of the '287 Patent. *See* Blake Dec., Ex. 2.

10. While it would appear to follow from this analysis that Vector is entitled to a judgment of non-infringement of Claim 1 of Giese's '712 patent and such claims as may be dependent thereon, this Court presently makes no such ruling, as Vector has not—yet—requested it.

granting defendants' summary judgment motion on the topic of laches." Giese Opp. Mem. at 2. Consequently, this Court GRANTS partial summary judgment to remove lost profits as a potential measure of damages.

■ Vector also seeks summary judgment to remove "future royalties" as a potential measure of damages. In a report submitted by Giese pursuant to Fed. R.Civ.Pro. 26(a)(1)(C), Giese's proffered expert witness Howard J. Gordon ("Gordon") sets forth several damages calculations. One of Gordon's calculations purports to ascertain "future royalties" to be imposed as damages against Vector. *See* Gordon Rep. at 5.

According to Gordon's Report, the total amount of claimed future royalties is $1,477,917. *See id.* To reach this amount, the report first adopts a ten percent royalty rate. According to Gordon, this royalty rate is based on "royalties paid by Vector to Giese on the so-called '252' patent which ... Giese owns and licensed to Vector in ... 1993" and "the increment between [Pierce's] selling price and the cost of goods sold also at 10% by year." Gordon Rep. at 4–5. The royalty rate is subsequently applied to Vector's projected future sales, net of cost, from June 30, 1998 until the end of the patent period in October 23, 2001.[11] Similarly, during his deposition, Gordon defined "future royalties" as "[t]he potential dollar amount of royalties that would be earned through the end of the patent [in] 2001." Gordon Dep. at 48.

While there is no apparent dispute as to the calculations used by Gordon, Vector argues that "future royalties" are not an available measure of damages in a patent suit. Rather, in the event that Vector is found to infringe the patents-in-suit, Vector correctly asserts that the Court "will be obliged to enjoin the Defendants' from making, using or selling the products adjudicated to infringe." Def.Mem. at 8; *ac-*

*cord* 35 U.S.C. § 283. At that point, Giese's only way to obtain any semblance of "future royalties" would be to negotiate. a license.

■ Giese argues that Gordon's expected testimony of future royalties is more properly characterized as testimony on "future sales." Future sales are relevant to the determination of a reasonable royalty rate for past sales, which is an appropriate measure of damages in this case. *See* 35 U.S.C. § 284; *Egry Register Co. v.. Standard Register Co.*, 23 F.2d 438, 443 (6th Cir.1928) (holding that future profits are "to be considered in retroactively determining a reasonable royalty"); *American Medical Sys., Inc. v. Medical Eng'g Corp.*, 794 F.Supp. 1370, 1393–94 (E.D.Wis.1992) (including "infringer's anticipated profits" in list of factors to consider in determining reasonable royalty) (*overruled on other grounds*, 6 F.3d 1523 [Fed.Cir.1993]); *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1121 (S.D.N.Y.1970) (considering "the anticipated amount of net profits that the prospective licensee reasonably thinks he will make") (*modified on other grounds*, 446 F.2d 295 [2d Cir.1971]).

As it stands, however, Gordon's report and testimony on "future royalties" cannot fairly be recharacterized as "future profits" or "anticipated sales." In his calculation of future royalties, Gordon explicitly considers Vector's anticipated profit as the *multiplicand. See* Gordon Rep., Sched. 6–7. It is therefore disingenuous for Giese to attempt to declare anticipated profit as the *product* of Gordon's calculation. Consequently, since there is no basis in patent law for this Court to award "future royalties," and characterizing Gordon's expected testimony as testimony on future sales is inappropriate, this Court GRANTS partial summary judgment to remove future royalties as a measure of damages. Since

---

**11.** Gordon's report determines Vector's projected future sales on the basis of its average sales during the last three years. *See id.* at 5.

anticipated profits are an appropriate factor to consider in determining a reasonable royalty, however, this Court allows Giese fourteen days to refile his Rule 26(a)(1)(C) report to correct Gordon's "mischaracterization."

## VI. Motion for Partial Summary Judgment Regarding the Validity of United States Patent No. 4,684,609

Federal jurisdiction must be predicated on the existence of a case or controversy between the parties. *See* U.S. Const. art. III, § 2. In the present action, there is a clear case or controversy as to the '712 and '914 patents because Giese alleges inducement of and contribution to infringement by Vector of the '712 and '914 patents. *See* Carroll Dec., Ex. 1 ¶¶ 10, 16. In response, Vector asserts counterclaims for declaratory judgment that it has not infringed the '712 or '914 patents (Count One), that the '712 and '914 patents are invalid (Count Two), and that the '712 and '914 patents are unenforceable (Count Three). *See* Mansfield Dec., Ex. 2.[12]

The instant motion, however, concerns the '609 patent. Vector owns the '609 patent and makes the Vectastain Kits pursuant to it. Giese does not mention the '609 patent in his Amended Complaint, nor does Vector counterclaim for a declaratory judgment regarding the '609 patent. Vector injected the '609 patent into this litigation in an introductory paragraph to the Counterclaim section of its responsive pleading. In that paragraph, Vector alleges that it makes and sells the Vectastain Kits pursuant to its '609 patent, and that the system disclosed in the '609 patent differs from that disclosed in Giese's '712 and '914 patents because the former uses a "labeling complex" while the latter uses a monomolecular layering system. *See id.*

In his answer to Vector's counterclaims, Giese offers several affirmative defenses, including "[t]o the extent that the defendant relies on the ['609 patent] as a defense, that patent is invalid and unenforceable under 35 U.S.C. §§ 102, 103, and 112." *See* Carroll Dec., Ex. 9.

Vector now seeks partial summary judgment, asking this Court to hold, as matter of law, that (1) it is without subject matter jurisdiction to consider the invalidity of the '609 patent; (2) the '609 patent must be deemed valid for purposes of this litigation; and (3) the claims of the '609 patent are patentably separable from the claims of the '712 and '914 patents. While it is clear beyond peradventure that this Court cannot act in the absence of subject matter jurisdiction, it make sense to reserve this issue until the other two have been considered.

### A. Presumption of Validity

■ There is a statutory presumption that an issued patent is valid. *See* 35 U.S.C. § 282. To overcome this presumption, the party asserting invalidity must prove facts supporting a determination of invalidity by clear and convincing evidence. *See, e.g., Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 446 (Fed.Cir.1986). Accordingly, unless this Court has jurisdiction to declare the '609 patent invalid, the statutory presumption will carry the day and the '609 patent will be deemed valid for purposes of this litigation.

### B. Patentable Separateness of the '609 Patent

■ Vector seeks judgment as matter of law that the claims of the '609 patent are patentably separable from the claims of the '712 and '914 patents.[13] *See* Def.

---

**12.** Because Giese has actually filed suit and Vector has actually produced an accused device with respect to the '712 and '914 patents, this Court has jurisdiction to hear these counterclaims for declaratory judgment. *See, e.g.,*

*Jervis B. Webb Co. v. Southern Sys., Inc.,* 742 F.2d 1388, 1398–99 (Fed.Cir.1984).

**13.** Patentable separateness is relevant to the infringement inquiry in that it is a factor to be considered when comparing the accused de-

Mem. at 6. Whether patent claims are patentably separable from one another is a question of fact. *See Knutson v. Gallsworthy,* 164 F.2d 497, 503 (D.C.Cir.1947). The standard for patentable separateness is set forth in 37 C.F.R. § 1.601(n):

> Invention "A" is the same patentable invention as an invention "B" when invention "A" is the same as (35 U.S.C. § 102) or is obvious (35 U.S.C. § 103) in view of invention "B" assuming invention "B" is prior art with respect to invention "A." Invention "A" is a separate patentable invention with respect to invention "B" when invention "A" is new (35 U.S.C. § 102) and non-obvious (35 U.S.C. § 103) in view of invention "B" assuming invention "B" is prior art with respect to invention "A."

█ It is undisputed that during the prosecution of the '609 patent, the Patent Office considered as prior art references United States Patent No. 4,282,287 ("the '287 patent"), which is the parent patent to the '712 and '914 patents, as well as an article co-authored by Giese ("the Costello Reference"). *See* Carroll Dec., Ex. 6. After reviewing the prior art references, the Board of Patent Appeals and Interferences stated that "there is no basis for a rejection under 35 U.S.C. § 102" and that "the examiner has also failed to make out a prima facie case of obviousness [under 35 U.S.C. § 103]...." *Id.,* Ex. 7 at 4. Thus, under the relevant regulation, the '609 patent is, without genuine dispute, a separate patentable invention from the '287 patent, which is prior art with respect to the '609 patent. *See* 37 C.F.R. § 1.601(n).

Accordingly, this Court grants Vector's motion for partial summary judgment as to the patentable separability of the '609 patent from the '712 and '914 patents, and will so construe the relevant claims.

vice to the plaintiff's device under the doctrine of literal infringement or the doctrine of equivalents. *See, e.g., Zygo Corp. v. Wyko Corp.,* 79 F.3d 1563, 1570 (Fed.Cir.1996); *National Presto Indus., Inc. v. West Bend Co.,* 76

## C. Subject Matter Jurisdiction

The question of subject matter jurisdiction over this aspect of the case turns on whether a case or controversy exists as to the validity of the '609 patent.

█ In order for a case to be justiciable and not an advisory opinion, two criteria must be met. First, there must be an actual dispute between adverse litigants. *See United States v. Johnson,* 319 U.S. 302, 304, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943). Second, there must be a substantial likelihood that a federal court decision in favor of a claimant will bring about some change or have some effect. *See Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 113–14, 68 S.Ct. 431, 92 L.Ed. 568 (1948).

█ Because the Court has ruled it undisputed that the '609 patent is patentably separable, that patent does not comprise the actual dispute in this case. Moreover, in order for this Court to have jurisdiction, the federal controversy must appear on the face of the complaint, unaided by the answer. *See, e.g., Gully v. First Nat'l Bank in Meridian,* 299 U.S. 109, 113, 57 S.Ct. 96, 81 L.Ed. 70 (1936); *cf. Coditron Corp. v. AFA Protective Sys., Inc.,* 392 F.Supp. 158, 161 (S.D.N.Y.1975) (declining to exercise federal jurisdiction over a contract action despite the defendant's assertion of an affirmative defense of patent invalidity).

In *Glaxo Wellcome, Inc. v. Pharmadyne Corp.,* 32 F.Supp.2d 265 (D.Md.1998), Glaxo alleged that Pharmadyne had infringed its '790 patent. *See id.* at 271. As an affirmative defense, Pharmadyne argued the invalidity of the '790 patent as well as Glaxo's '431 patent. Glaxo had not alleged infringement of its '431 patent, and sought to dismiss the '431 patent from the

F.3d 1185, 1192 (Fed.Cir.1996) (noting that in the infringement inquiry, "[t]he fact of separate patentability is relevant, and is entitled to due weight.").

litigation on the ground that the court lacked subject matter jurisdiction over the validity of that patent. The court granted the motion, noting that there was no explicit threat of an infringement suit concerning the '431 patent and that there was no present activity by Pharmadyne which could constitute infringement of the '431 patent. *See id.* at 273. Similarly, the validity of the '609 patent would be a justiciable issue here only if Vector had alleged infringement of the '609 patent against Giese or some third party. Thus, this Court holds, as matter of law, that it does not have subject matter jurisdiction to consider the invalidity of the '609 patent.[14]

### VII. Motion for Partial Summary Judgment Denying Recovery for Infringement of the '914 Patent Claims Under the Doctrine of Intervening Rights

Vector seeks judgment as matter of law that under the doctrine of intervening rights, Giese cannot recover damages for infringement of the '914 patent. The doctrine of intervening rights provides that:

A reissued patent shall not abridge or affect the right of any person ... who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States ... anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used or imported....

35 U.S.C. § 252. The doctrine applies to reexamined patents, such as the '914 patent, as well as to reissued patents. *See* U.S.C. § 307. A successful intervening rights defense does not compel a judgment of non-infringement; rather, it is a limitation on damages that may be awarded to the plaintiff once infringement has been

determined. *See BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,* 1 F.3d 1214, 1220 (Fed.Cir.1993).

The defendant to an infringement action may raise the defense of intervening rights only when none of the infringed claims of the reissued or reexamined patent were present in the original patent. *See* 35 U.S.C. § 252; *BIC Leisure Prods.,* 1 F.3d at 1220. As noted in a previous section of this opinion, this Court holds Claims 25, 27, and 43–73 invalid for impermissible broadening during the reexamination process. *See* Part III., *supra.* Thus, the only claim relevant to this motion for partial summary judgment is Claim 26.

If the finder of fact ultimately determines that Vector has not infringed Claim 26, the issue of damages—and thus the defense of intervening rights—is moot. If the finder of fact concludes that Vector did infringe Claim 26, Vector cannot rely on the doctrine of intervening rights because Claim 26 was disclosed in the original '914 patent. Accordingly, this Court DENIES Vector's motion for partial summary judgment regarding the doctrine of intervening rights.

### VIII. Motion for Partial Summary Judgment on the Ground that Giese Made Material Omissions of Prior Art Known to Giese During the Prosecution of the '914 and '712 Patents.

In its final motion, Vector seeks judgment as matter of law that Giese made omissions of material prior art references that were known to him prior to and during the prosecution of the '712 and '914 patents. Vector intends to use such judgment at trial in order to argue that the '712 and '914 patents are unenforceable on account of Giese's inequitable conduct. *See* Def.Mem. at 2. Inequitable conduct by the patentee is an affirmative defense. *See Cabinet Vision v. Cabnetware,* 129 F.3d 595, 600 n. 4 (Fed.Cir.1997).

**14.** To the extent that the parties rely on the line of cases culminating in *Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993), their arguments are inapposite, because these cases concern the jurisdiction of an intermediate appellate court, not a trial court. *See id.* at 95.

Vector failed to plead the affirmative defense of inequitable conduct in its first responsive pleading. *See* Mansfield Dec., Ex. 8. "Generally speaking, failure to plead an affirmative defense results in a waiver of the defense *and the exclusion of all evidence relevant to it.*" *Conjugal Partnership Comprised By Joseph Jones and Verneta G. Jones v. Conjugal Partnership Comprised of Arthur Pineda and Toni Pineda,* 22 F.3d 391, 400 (1st Cir. 1994) (emphasis added). A trial court may grant a party's motion for leave to amend its pleadings when no prejudice would result. *See* Fed.R.Civ.P. 15(b). Vector moved to amend its pleadings on October 19, 1998. On November 3, 1998, this Court denied Vector's motion for leave to amend. On December 8, 1998, this Court denied Vector's motion for reconsideration of the denial. Accordingly, this Court denies this motion for partial summary judgment because Vector has waived the defense of inequitable conduct and the opportunity to present evidence relevant to it. *See Conjugal Partnership,* 22 F.3d at 400.

## IX. Conclusion

For the foregoing reasons, Vector's six motions for partial summary judgment are GRANTED in part and DENIED in part.