Kathleen M. PAYNE, Plaintiff,

v.

HUNTINGTON UNION FREE SCHOOL DISTRICT, Robert T. Lee, Carol Hartough, Cynthia Brooks, Lynn Kaufman, and Eunice Marchi, Defendants.

No. Civ.A. 99–2847–WGY.

United States District Court, E.D. New York.

July 26, 2002.

Scott M. Mishkin, Mishkin & Tully, LLP, Islandia, NY, for plaintiff.

Jonathan B. Vruno, Kaufman, Borgeest & Ryan, New York City, for defendants.

## MEMORANDUM AND ORDER

YOUNG, District Judge.[1]

The Plaintiff, Kathleen M. Payne ("Payne"), brings this section 1983 action against the Huntington Union Free School District (the "District"), and its governing school board, comprised of Robert T. Lee, Carol Hartough, Cynthia Brooks, Lynn Kaufman, and Eunice Marchi (collectively the "Board"). Payne alleges that the District and the Board selectively applied various District hiring policies in a way that resulted in her termination as a part-time English teacher. The District and the Board now move for summary judgment on all counts of the complaint pursuant to Federal Rule of Civil Procedure 56(b).

## I. BACKGROUND

Payne's husband, Kevin Colpoys ("Colpoys"), is the superintendent of the District. Payne Dep. at 15. During the summer of 1997, a full-time English teacher employed within the District developed cancer, and therefore needed to shift to part-time status to attend chemotherapy sessions. Kaufman Aff. ¶ 3. As a result, the District needed to hire a part-time English teacher to make up the shortfall in teacher resources. In August 1997, Colpoys informed Payne that a part-time English teacher position was available within the District. Payne Dep. at 12, 15. Payne immediately applied for that job, and was interviewed within hours of contacting the District. Id. at 17.

In the District, the process for hiring a new teacher, full- or part-time, requires two steps. First, the superintendent must recommend a candidate to the Board. Id. at 35; Colpoys Dep. at 22, 24. Second, the Board must approve the candidate's appointment. Colpoys Dep. at 22, 24. On August 27, 1997, after disclosing that Payne was his wife and describing the circumstances that necessitated hiring a part-time teacher, Colpoys recommended Payne to the Board. Colpoys Aff. ¶ 3. The Board voted to approve Payne's appointment notwithstanding her relationship to Colpoys, and awarded her a one-year part-

1. Of the District of Massachusetts, sitting by designation.

time English teacher's contract. Lee Aff. ¶ 9. The teaching position was understood (in August 1997) by all the parties to be a part-time, non-probationary, temporary position to which no seniority, tenure, or recall rights attached, and that was not guaranteed to be extended an additional year. Payne Dep. at 34. The contract was to end on June 30, 1998.

During June 1998, however, Payne was apparently recommended by her Principal to teach three English classes the following year, and subsequently issued a class schedule. *Id.* at 47–48. During the previous year, however, the Board had determined that it did not want to continue to have the superintendent's wife working for the District. Hirschhorn Dep. at 18–19. Accordingly, the Board notified Colpoys that it desired that Colpoys not put Payne's name forward for appointment. Colpoys Dep. at 72. Colpoys did not submit Payne for another appointment, and subsequently sent his wife a letter notifying her that her contract would not be renewed for the 1998–99 school year. *Id.* at 80, *see* Def.Ex. F.

Payne subsequently filed this suit, initially alleging that she had been fired because of her marriage to Colpoys, and that such action constituted an unconstitutional infringement of her fundamental right to marry. Payne has since abandoned that claim. Instead, Payne now argues that the District and the Board engaged in an unconstitutional selective application of official policies, violating her rights established pursuant to the Equal Protection Clause of the Fourteenth Amendment. U.S. Const. amend. XIV, § 1. Discovery has closed, and the District and the Board have moved for summary judgment.

## II. DISCUSSION

The District and the Board together proffer three arguments. First, the District contends that its liability is alleged to be predicated on a policy or custom that infringes Payne's rights, and that no such policy or custom exists. Second, the District contends that, even if such a policy exists, the undisputed facts of this case demonstrate that, as matter of law, no equal protection violation occurred. Last, the Board (whose members are sued in their individual capacities) argues it is entitled to qualified immunity for its actions.

### A. Custom or Policy

The general contours of municipal liability under section 1983 are well established:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a govern-ment's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The District argues that the only policy that it had was actually a pro-nepotism policy, whereby many relatives of current employees were hired within the district. Thus, so the District argues, the policy actually favored Payne—a relative of a current employee—and cannot have harmed her constitutionally. For her part, Payne essentially argues that there was also a one-time anti-nepotism policy, applied only to her.

■ Both sides, it appears, are fixated on the "policy or custom" language in *Monell,* and have overlooked the refinements of municipal liability articulated by the Supreme Court in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), and subsequent cases. In *Pembaur,* the Supreme Court explained:

[I]t is plain that municipal liability may be im-posed for a single decision by municipal policy-makers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy.

Id. at 480, 106 S.Ct. 1292 (citing *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), which held that a city council firing the plaintiff without a pre-termination hearing constituted a government policy). To be sure, only those individuals whose decisions constitute "final policymaking authority" for the municipality concerning the action alleged to have caused injury may expose the municipality to section 1983 liability. *McMillian v. Monroe County*, 520 U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (quoting *Jett v. Dallas Independent School District*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), which held that because the scope of "final policymaking authority" is an issue of state law, the case had to be remanded to decide whether a school superintendent was the "final policymaking authority").

█ In determining whether a local government actor has "final policymaking authority," two considerations are critical:

First, the question is not whether [the local government actor acts for the municipality] in some categorical, "all or nothing" manner. Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue.

*McMillian*, 520 U.S. at 785, 117 S.Ct. 1734. "[T]hose officials who have the power to make official policy on a particular issue" possess final policymaking authority. *Jett*, 491 U.S. at 738, 109 S.Ct. 2702. Thus, in *Jett*, a case wherein the contested action regarded the transfer of personnel within a school district, the appropriate question was whether the local government actor "possessed final policymaking authority in the area of employee transfers." *Id.; see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion) ("[T]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business"). Second, the "final policymaking authority" inquiry is governed by state law. *McMillian*, 520 U.S. at 785, 117 S.Ct. 1734.

█ In this case, therefore, the question is whether, under New York law, the Board was the "final policymaking authority" with respect to the hiring and firing of teachers. It seems undisputed that the Board does have such authority. No person may be hired absent approval of the Board. New York law states that the Board powers shall include "the superintendence, management and control of said union free schools" N.Y.Educ. Law § 1709(13), and the ability "[t]o contract with and employ such persons as ... are qualified teachers," *id.* § 1709(16). Accordingly, the decision by the Board relating to Payne's employment status constitutes a policy of the municipality, regardless of whether the policy will ever be repeated again.

### B. Selective Enforcement

█ The District next argues that it cannot be held liable because Payne has adduced insufficient evidence to make out

a prima facie case of selective enforcement. The seminal selective enforcement case in the Second Circuit is *LaTrieste Restaurant & Cabaret, Inc. v. Village of Port Chester*, 40 F.3d 587 (2d Cir.1994). To prevail in a selective enforcement claim, a plaintiff must prove: (1) that she was selectively treated in comparison with others similarly situated; and (2) the selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Id.* at 590.

The Supreme Court, however, has cast doubt on the validity of the second prong of *LaTrieste*, insofar as it requires that the selective enforcement be motivated by either an impermissible motive or a malicious intent to injure the person. In *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam), the Supreme Court held that a complaint which alleged that the complained-of enforcement was "irrational and wholly arbitrary" was sufficient to survive a motion to dismiss, irrespective of whether the complaint had pled that the motivation was due to "ill will" or the like. *Id.* at 565, 120 S.Ct. 1073.

The Second Circuit, in dicta, initially indicated that it read *Willowbrook* to eliminate the ill will or impermissible considerations requirement of *LaTrieste*. *E.g.*, *Jackson v. Burke*, 256 F.3d 93, 97 (2d Cir.2001) (per curiam) ("[P]roof of subjective ill will is not an essential element of a 'class of one' equal protection claim."); *Gelb v. Bd. of Elections*, 224 F.3d 149, 157 (2d Cir.2000) (noting that, even absent allegation of animus, "it may well be that the Board engaged in arbitrary, purposeful and intentional discrimination," and allowing claim to get past summary judgment on that basis). The Second Circuit, however, subsequently retreated from that interpretation of *Willowbrook* in *Harlen*

*Associates v. Incorporated Village of Mineola*, 273 F.3d 494 (2d Cir.2001), and *Giordano v. City of New York*, 274 F.3d 740 (2d Cir.2001).

In *Harlen*, a prospective 7–Eleven convenience store owner claimed that the Village of Mineola was selectively enforcing zoning regulations, prohibiting the owner from obtaining the necessary special permits required to operate the store. *Harlen*, 273 F.3d at 499. The Second Circuit noted that, contrary to its previous dicta discussions, the district court and several circuit courts had not read *Willowbrook* to obviate the need to establish animus. *Id.* at 500 (citing *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir.2000), *cert. denied*, 531 U.S. 1080, 121 S.Ct. 781, 148 L.Ed.2d 678 (2001), and *Shipp v. McMahon*, 234 F.3d 907, 916 (5th Cir.2000)). Assuming, *arquendo*, that *Willowbrook* ought be read as the plaintiff advocated, the Second Circuit concluded that under the proffered reading a plaintiff must "show either that there was no rational basis for the unequal treatment received, or that the denial of the application was motivated by animus." *Harlen*, 273 F.3d at 500 (internal citations omitted). It concluded that the plaintiff had failed to prove that no rational basis existed for the village's actions.

In *Giordano*, a police officer alleged that a police department selectively applied its policy against permitting officers taking certain medications from continuing service on the police force. *Giordano*, 274 F.3d at 743. The Second Circuit again flagged the unresolved issue of whether a "class of one" plaintiff must plead and prove "ill will," and refused to resolve the issue. *Id.* at 751. Instead, the Second Circuit noted that even if a selective enforcement equal protection plaintiff were not required to demonstrate ill will, "such a plaintiff would still be required to show,

not only 'irrational and wholly arbitrary' acts, but also *intentional* disparate treatment." *Id.* (internal citations omitted). Meeting this burden required that the plaintiff show "that those responsible for terminating him ... knew that they were treating him differently from anyone else." *Id.* At a minimum, this required demonstrating that the decision-makers knew there were other similarly-situated individuals who were being treated differently. *Id.* Absent such evidence, no reasonable fact finder could conclude that the decision-makers *intentionally* treated the plaintiff differently. *Id.*

Three courts within the Second Circuit, all within the District of Connecticut, have recently considered the impact of *Willowbrook* and its progeny. In *Barstow v. Shea*, 196 F.Supp.2d 141 (D.Conn.2002), the court adopted without discussion the language in *Giordano* indicating that evidence of intentionally different treatment that was "wholly arbitrary" and without rational basis was adequate to survive a motion for summary judgment. *Id.* at 148. In *Tuchman v. Connecticut*, 185 F.Supp.2d 169, 173 (D.Conn.2002), the court again adopted language indicating that either lack of rational basis or ill will would suffice to permit a selective enforcement claim to survive a motion for summary judgment. In *Padilla v. Harris*, No. 3:01CV1661(JBA), 2002 WL 750856 (D.Conn. Apr.24, 2002), the court engaged in a thorough examination of the available jurisprudence, and concluded that *Willowbrook* foreclosed the possibility of requiring evidence of "ill will" to survive a motion for summary judgment. *Id.* at *2.

This Court need not reconcile *Willowbrook* with lower court decisions trying to make sense of that case; it will accept, *arguendo*, Payne's argument that if the complained-of state action is either wholly arbitrary and without rational basis, or motivated by "ill will," she has met her burden. Accordingly, in order to survive this motion for summary judgment, Payne must prove that: (1) a group of similarly-situated individuals exists; (2) she was treated differently than the group; (3) the decision maker intentionally treated her differently; and (4) the motivation for the disparate treatment was: (a) based on impermissible reasons such as race; (b) based on ill will or personal animosity; or (c) made for wholly arbitrary reasons lacking any rational basis.

### 1. Are There Others Similarly Situated?

The first element a plaintiff must prove to succeed on a selective enforcement claim is that there exists a group of similarly-situated individuals. Payne argues that the group of individuals whose blood or marriage relatives are employed by the District is the appropriate group of similarly-situated individuals whose treatment ought serve as the benchmark. Payne has identified over 100 such individuals, the vast majority being sisters, one of whom, for example, is a teacher and one a typist, or husbands and wives, both of whom are teachers. Compl. app. A.

The District argues that there are no other similarly-situated individuals, because no one else was the superintendent's wife. In essence, so the argument goes, the unique power of the superintendent—especially as the sole individual with the power to recommend employment to the Board, and as the individual to whom all others in the District report—preclude his wife from being similarly situated to any other employee in the District, since she, and she alone, would have unfettered access to the superintendent.

Payne counters that, even if her proffered group is not considered, there is nonetheless a group of related individuals who are in supervisory-subordinate rela-

tionships, and thus similarly situated to that of the superintendent and a part-time English teacher. In the appendix to her Complaint, Payne identifies three such relationships. First, the Giannis—the athletic director is the brother of an assistant coach and the father of the head coach. Second, the Marchis—a Board member is the aunt of a teacher and a security guard. Third, allegations that there exist two former employees—one the spouse of a former superintendent and the other the spouse of a former assistant superintendent.[2] Despite being in supervisory-subordinate relationships, the District argues that these three sets of individuals are not situated similarly to Payne.

Invoking the familiar burden of production summary judgment imposes on Payne to proffer some admissible evidence to support each element of her claim, the District argues that with respect to the third set of individuals—the alleged spouses of a former superintendent and assistant superintendent—there is no admissible evidence of the existence of such people. The only evidence Payne proffers to prove such individuals existed is the affidavit of Colpoys, wherein he states "I was aware at that time, that previously there had been another teacher who was employed by the District while her husband was the superintendent, as well as a teacher at the District who was married to an assistant superintendent." Colpoys Aff. ¶ 14. This is not a sufficient proffer of record evidence to create a genuine dispute of material fact in a motion for summary judgment. The evidence in this form plainly is not admissible, there is no foundation and the statement is not made on personal knowledge. *See* Fed.R.Evid.

602. Merely being "aware" of purported facts is a far cry from having investigated the payroll files, or the like, sufficient to obtain personal knowledge; indeed, even the individuals' identities are unknown to Colpoys. He simply offers a conclusory statement that is not backed up by even a scintilla of proof. On this record, the Court cannot accept such a bald assertion of an unsubstantiated fact in its consideration of this motion for summary judgment. *E.g.*, *Harlen*, 273 F.3d at 502 ("[W]e will uphold a grant of summary judgment where the nonmoving party adduces nothing more than speculation to support its claims."); *Albert v. Loksen*, 239 F.3d 256, 266 (2d Cir.2001) (ruling that a plaintiff may not rely on hearsay or conclusory allegations to get past summary judgment).

■ The two other allegedly similarly-situated individuals are not sufficiently similar. In general, similarly-situated individuals must be situated very similarly indeed. To be considered similarly situated, employees must be "similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir.1997) (citing *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir.1992)). In *Shumway*, where a manager new to a division had enforced an anti-fraternization policy previously unenforced, the Second Circuit held the relevant class of individuals were those who had been caught violating the policy while being supervised by new manager, not those detected but ignored by the previous manager. *Id.* Similarly, in *Cruz v. Coach Stores*, 202 F.3d 560, 568 (2d Cir.2000), in considering a claim of selective enforcement of a policy calling for termination of employees who

---

2. There are other related individuals who work at different command levels, such as principal and teacher. These other relationships, however, are not in the same "chain-of-command" structure. For instance, a principal at one school may be married to a teacher at another school. The principal would have no ability to influence evaluation of the teacher, as a different principal supervises the teacher.

engage in fighting or verbal assault, the Second Circuit held that those similarly situated were those who had engaged in fighting, as had the plaintiff, not those who merely had engaged in verbal assault. *Id.* at 568. Finally, in *Gonzalez v. City of New York,* No. 00–9520, 2002 WL 500313 (2d Cir. Apr.3, 2002) (unpublished summary order),[3] where the plaintiff asserted the police selectively enforced traffic laws to pull him over, the Second Circuit concluded that the appropriate group of similarly-situated individuals were those individuals who were driving erratically and with the passenger side door open—of which there were none. *Id.* at *1. In short, the pairs of individuals proffered by Payne must be in materially the same relationship as Payne and Colpoys.

The Payne–Colpoys relationship has several distinguishing features. First, Colpoys directly supervises those who must evaluate his wife's professional performance. Thus, the Giannis are not similarly situated. The Athletic Director Gianni *directly* evaluates his father and brother, the coaches. Accordingly, there is no danger that Athletic Director Gianni's position will improperly influence others evaluating his father. Second, Colpoys is the superintendent. As such, he is the "chief executive officer of the school district." N.Y.Educ.Law § 1711(2)(a). The superintendent is empowered to "enforce all provisions of law and all rules and regulations relating to the management of the schools and other educational, social and recreational activities under the direction of the board of education." *Id.* § 1711(2)(b). The superintendent supervises the selection of textbooks and preparation of the courses of study to be taught.

*Id.* § 1711(2)(c) and (d). Most importantly, the superintendent supervises and directs

> associate, assistant and other superintendents, directors, supervisors, principals, teachers, lecturers, medical inspectors, nurses, auditors, attendance officers, janitors and other persons employed in the management of the schools or the other educational activities of the district ... transfer [of] teachers from one school to another, or from one grade of the course of study to another grade in such course ... [and has the authority to] suspend an associate, assistant or other superintendent, director, supervisor, expert, principal, teacher or other employee....

*Id.* § 1711(2)(e). No other employee of the District is so empowered. Thus, no other employee of the District could possibly be situated similarly to Colpoys—and therefore no spouse or relative of another District employee could be situated similarly to Payne. Payne seeks to make much of the fact that the niece and nephew of a Board member are employed by the District. There are several problems with this analogy. First, a Board member is not an employee of the District. More importantly, there is a qualitative difference between a Board member and the superintendent. A Board member is just that—a member of a group of seven of which the majority usually rules. Thus, at best, a Board member can hope to influence her fellow Board members to take an action. The superintendent, however, shares authority with no one. To be sure, the Board has supervisory powers—but the superintendent exercises near imperial authority on a day-to-day basis.

3. For the propriety of citing an unpublished decision, see *Anastasoff v. United States,* 223 F.3d 898, 899–905 (8th Cir.) (R. Arnold, J.) (holding that unpublished opinions have precedential effect), *vacated as moot,* 235 F.3d 1054 (8th Cir.2000) (en banc), *Giese v. Pierce Chemical Co.,* 43 F.Supp.2d 98, 103 (D.Mass. 1999) (relying on unpublished opinions' persuasive authority), and Richard S. Arnold, *Unpublished Opinions: A Comment,* 1 J.App. Prac. & Process 219 (1999).

Moreover, Payne was merely a part-time temporary employee. It appears that all the other relationships identified do not involve temporary employees, nor part-time employees—they involve full-time permanent employees. It is often the case, for varied reasons, that temporary or part-time employees are treated differently than full-time or permanent employees. Accordingly, it seems patently clear to this Court that any similarly-situated group must be comprised of part-time or temporary employees—perhaps both. Payne has identified no group of part-time or temporary employees who are related to key decisionmakers in the District who were treated differently than she was.

Accordingly, the Court holds that Payne has failed to proffer admissible evidence identifying any group of similarly-situated individuals. There being no such group, Payne cannot make out a prima facie case of selective enforcement.

### 2. Was Payne Intentionally Treated Differently?

Even if some group of similarly-situated individuals were to be identified, and even if Payne were treated differently than members such a group,[4] Payne's cause of action would still fail as matter of law. Payne must prove that the different treatment complained of—that she was terminated while other persons in similar situations were not—was intentional.

In *Giordano*, a police officer began taking an anti-coagulant drug to treat his medical condition. 274 F.3d at 744. A medical review board recommended his discharge. *Id.* at 745. The police commissioner accepted the medical review board's recommendation and discharged Giordano. *Id.* at 751. The Second Circuit held that Giordano needed to proffer evidence dem-

onstrating that the decision-makers—in his case the medical review board and the police commissioner—knew that other similarly-situated individuals existed. *Id.* Absent such information, no jury could infer that they *knew* they were treating Giordano differently than those similarly situated. *Id.*

Payne similarly fails to proffer evidence that the conduct she complains of was intentional. That is, Payne proffers no evidence that the Board *knew* it was treating her differently than it treats other similarly-situated individuals. To be sure, the Board may very well have known many related parties were employed within the District. No evidence supports the proposition, however, that the Board knew other parties with a relationship such as Colpoys–Payne—one in which one party supervised the other party's supervisors—were employed in the District and not fired. In reality this is because no such individuals existed—there are no individuals situated similarly to the spouse of the superintendent. Assuming such individuals existed, however, no evidence exists to demonstrate that the Board knew of them. An argument can be made that Board Member Marchi, whose niece and nephew were employed by the District, knew of at least one such relationship—hers. Assuming that this relationship were situated similarly to that of Payne–Colpoys, there is no evidence the Board knew that it was treating Payne differently than the Marchis.

### 3. Did the Board Harbor Ill Will Toward Payne?

Even assuming that Payne could demonstrate that there was a group of similarly-situated individuals, that she was treated differently than those individuals, and

---

4. The Court notes that Payne has failed to prove differential treatment, that is, no part-time or temporary employee who has a rela- tive in a supervisory position has had their contract extended for another term.

that the Board intentionally treated her differently, Payne's claim must still fail. To prevail, Payne must prove either improper motive (ill will) or that the Board's decision lacked any rational basis. The parties agree that no improper motive such as race or gender bias is at issue. The parties disagree, however, as to whether evidence of ill will has been adduced. Acknowledging the familiar burdens of a motion for summary judgment, it falls to Payne to proffer evidence which, drawing all reasonable inferences in her favor, would allow a jury to render a verdict in her favor.

Payne identifies several factors which she asserts demonstrate ill will. First, the Board told Colpoys that it had voted not to re-hire Payne, that he must fire her and not submit her name to the Board for reappointment, and that noncompliance would be deemed insubordination, inadvisable in light of his impending annual review. Second, Payne was fired without thirty days notice, in spite of positive reviews from her supervisors, and was awarded separation pay despite a general policy not to award separation pay to part-time or temporary teachers. Third, the Board met in closed session to discuss her position and the feasibility of disregarding a longstanding custom and policy of hiring and retaining married couples. *See* Pl.'s Mem. at 15–16.

The Board contends that this evidence does not support an inference of ill will toward Payne. First, the Board contends that it, not the superintendent, had the power to hire and fire. Thus, it could not have coerced Colpoys into any action regarding the hiring and firing of personnel, as those matters are within its discretion—as a practical matter, it could only notify Colpoys of the decision it made. Moreover, allegations that the Board threatened

Colpoys's job if he did not comply do nothing to bolster an inference of ill will toward her. Rather, the reasonable inference to be drawn is that there was ill will between Colpoys and the Board. *See* Def.'s Reply Mem. at 7.

Second, as to firing in contravention of supervisor recommendations, the Board contends that this had always been its concern—that Payne's supervisors would be pressured to give glowing evaluations of Payne because of her husband's authority. Furthermore, having made the decision not to re-employ Payne, the Board asserts that Colpoys failed to follow the thirty-day notice requirement by his own error, but suggested the Board authorize a thirty-day pay settlement instead, which it did. Thus, the Board argues that the failure to follow ordinary procedures and the decision to provide separation pay were necessitated by Colpoys's actions, not theirs. *Id.* at 7–8.

Last, the Board asserts there is nothing improper about excluding the husband of the individual whose employment it is considering from discussions of the individual's employment status. Moreover, Colpoys understood that when the Board dealt with matters concerning the superintendent, it could request that he not attend the session. *Id.* at 8.

In *Willowbrook*, the plaintiff contended that the ill will was personal animus arising out of a previous, successful lawsuit brought by him against the village. 528 U.S. at 563, 120 S.Ct. 1073. *Willowbrook* came before the Supreme Court on a motion to dismiss, and the Supreme Court did not reach the ill will issue, but it is easy to see how ill will could have been proved—proof of the lawsuit, proof of the judgment, public or private comments about the suit or the plaintiffs, and a lack of any rational reason for taking the action.[5]

---

**5.** In this respect the rational basis inquiry intersects with the ill will inquiry. Conceptu-

Similarly, in *Harlen*, the Second Circuit rejected the plaintiff's proffer of evidence to support an inference of ill will. Harlen proffered three facts that he asserted supported such an inference: (1) the community was opposed to granting a permit to operate a 7–Eleven convenience store; (2) the Mayor—who sat in on the zoning board meeting—lived down the street from the proposed store location; and (3) the reasons given Harlen in the official letter of denial were, in part, different from those he had been given orally following the zoning meeting. *Harlen*, 273 F.3d at 502–03. The Second Circuit noted it would "uphold a grant of summary judgment where the nonmoving party adduces nothing more than speculation to support its claims." *Id.* at 502. In rejecting the proffer, the Second Circuit attributed significance to the fact that Harlen had not identified any animus directed by the zoning board at him personally. *Id.* Instead, the animus at best reflected dislike for the idea of having a 7–Eleven store in the neighborhood. *Id.* at 503. It is personal animus, however, that the Equal Protection Clause prohibits. Moreover, the Second Circuit held that all of Harlen's asserted evidence of personal animus was adequately explained to be founded on permissible concerns, not on personal animus. *Id.*

Payne, like the plaintiff in *Harlen*, cannot demonstrate personal animus. The vast bulk of her proffered evidence is merely that the Board did not rehire her. At issue, however, is whether she was fired because of personal animus against her. It is not enough merely to assert that a jury might not believe the Board's proffered reasons. Payne must proffer evidence to support a jury finding that the Board took its actions *because of* personal animus against her—active malicious ill will toward her.

Payne can point to no personal animus—no interpersonal tensions, no history of confrontation, nothing. Moreover, the proffered evidence of impropriety is like that of *Harlen*—easily refuted by undisputed evidence of motive other than personal animus.[6] In this case, it is undisputed that the Board told Colpoys that it had decided not to rehire Payne because it "did not want to continue an employment relationship between married couples or relatives where there may be a conflict of interest or presumption of impropriety in personnel matters." Colpoys Aff. ¶ 34. In short, the evidence here is merely speculation or conjecture. It is not evidence of personal animus. The underlying cry of Payne's complaint, proffered proof, and memoranda is that she was fired because she was Colpoys's wife. Payne asserts that if she was fired because of her spouse's position, that constitutes personal animus—they were out to get her because of who she was. That, however, is not the sort of personal animus proscribed by the Equal Protection Clause.

*4. Was the Board's Decision Rational?*

Payne's most promising argument is that the Board's decision[7] lacked any ra-

---

ally, however, the ill will method of establishing improper conduct addresses the situation in which a rational basis is proffered by the defendant, but is mere pretext.

**6.** Though in reality similar to the rational basis analysis, this analysis focuses on whether the defendant has refuted evidence of motive other than personal animus, or otherwise presented sufficient evidence to show personal animus. Thus, an entirely arbitrary and

irrational motive that nonetheless lacks personal animus is not actionable under this method of establishing liability, though it is perhaps actionable under the rational basis method of establishing liability.

**7.** Throughout this opinion the Court has fumbled with its terminology because of one crucial fact—Payne was never fired. The undisputed facts are as follows: Payne had a one-year contract that was to end on June 30,

tional basis. Assuming that Payne could prove all the other requisite elements, the core of her complaint is that the District and the Board drew a distinction between her and others—it classified her without rational basis. But this claim faces a tremendous uphill battle. In examining state classifications under the rational-basis standard, the Supreme Court has commented that

> [t]his inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. Such action by a legislature is presumed to be valid.

*Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (internal citations omitted). In this case, electing not to rehire the superintendent's wife was rationally related to a legitimate municipal policy identified by the Board—preserving morale by preventing the appearance of impropriety. While this action was not taken by a legislature, and therefore perhaps not entitled to deference, in this case the Court holds that the decision rests on a patently rational basis. Just as the Court recognizes that the head of an organization is uniquely situated, so the Court recognizes that the head of an organization is uniquely observed, subject to close scrutiny over every official action. Accordingly, it is quite reasonable to impose a higher standard of conduct on the head of an organization. This manifests itself, in this instance, in the refusal to re-hire Payne.

Payne counters that, had the Board been concerned about avoiding conflict of interest and the like, it should never have hired her, and should have fired the other related employees. Pl.'s Mem. at 17. In essence, Payne acknowledges that the purported goal is rationally related to a legitimate government interest, but contends that either the classification of her as a group of one is improper, or the proffered reason is mere pretext. Payne, however, proffers no proof to support an inference of pretext. The classification, as previously discussed, is rational. Accordingly, Payne's arguments fail to overcome the high hurdle associated with demonstrating the absence of a rational basis for government action.

Last, the Court notes that to adopt Payne's arguments would mean that the Board could never implement an anti-nepotism policy. In essence, Payne argues that to institute such a policy, the Board would need to fire all current employees with relatives employed by the District. According to Payne, simply letting their contracts expire and not rehiring them is insufficient. Such a solution would be unworkable, which reflects Payne's inability to make out a single element required to establish a prima facie case of selective enforcement.

---

1998. Prior to the end of her appointment, Payne had been asked by her school principal to teach several classes the next school year. All parties concerned, however, knew that a future contract was dependent upon the superintendent putting forward her name for approval by the Board. In June 1998, the Board elected not to extend her contract, and directed the superintendent to inform Payne.

The Supreme Court has observed that constitutional concerns associated with a failure to rehire are significantly less serious than those associated with an outright firing. *E.g., Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 282–83, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (plurality opinion); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 575–79, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). While the Court has analyzed Payne's case without considering these cases, it is possible that Payne is entitled to far less constitutional protection than this Court affords her.

## C. Qualified Immunity

Analysis of the defense of qualified immunity requires two steps. First, there must be a constitutional violation. Second, the constitutional right alleged to have been violated must be clearly established at the time of the violation. *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). As there was no violation of Payne's constitutional rights in this case, there is no need to address the issue of qualified immunity.

## III. CONCLUSION

Though artfully pled, Payne's lawsuit against the Board and the District is utterly lacking in the factual support required to survive summary judgment. There are no similarly-situated individuals—Payne is unique as the sole individual within the District married to its "chief executive officer." Moreover, there is no group of part-time or temporary employees whose contracts were permitted to expire, further foiling Payne's argument that a group of similarly-situated individuals existed. Further, Payne cannot demonstrate that any action was motivated by "ill will" to do her harm—she proffers no motive, no facts, and no evidence. Finally, the Board's actions were rationally related to a legitimate state interest; thus, the actions were not arbitrary or capricious. In short, Payne's claim of harm is simply not of constitutional magnitude, and summary judgment ought be and hereby is granted as to all defendants.

Accordingly, the Defendants' motion for summary judgment [Docket No. 67] is ALLOWED.