M. Pierre **RAFIY, M.D., and Philip Rafiy, M.D.,** Plaintiffs,

v.

**NASSAU COUNTY MEDICAL CENTER, County of Nassau, Bruce P. Meinhard, M.D., and Anthony Angelo, M.D.,** Defendants.

No. Civ.A. 99–0112–WGY(TCP).

United States District Court,
E.D. New York.

Sept. 5, 2002.

Frederic D. Ostrove, Leeds & Morelli, Carle Place, NY, for Plaintiffs.

Charles D. Cunningham, Stewart Jay Epstein, Snitow & Cunningham, LLP, New York City, for Defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.[1]

## I. INTRODUCTION

Dr. M. Pierre Rafiy ("Pierre Rafiy") and his son, Dr. Philip Rafiy ("Philip Rafiy") (collectively the "Rafiys") bring this civil action pursuant to 42 U.S.C. § 1983 and the Sherman Act, 15 U.S.C. §§ 1 and 2, against the Nassau County Medical Center (the "Medical Center"), the County of Nassau (the "County"), Dr. Bruce Meinhard ("Meinhard"), and Dr. Anthony Angelo ("Angelo") (collectively the "Defendants"). The Rafiys argue that actions taken by the Defendants to relieve the Rafiys of "on call" assignments at the Medical Center's Emergency Room and of assignments to supervise resident physicians at the Medical Center's orthopedic outpatient clinic effected a deprivation of property—professional hospital privileges—without due process of law in violation of the Due Process Clause of the Fourteenth Amendment (Count One), amounted to racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment (Count Two), constituted retaliation for the exercise of free speech rights in violation of the First Amendment (Count Three), and reflected monopolistic practices and a combination or conspiracy in restraint of trade in violation of the Sherman Act (Count Four).

The Defendants have moved collectively for summary judgment. They argue that, with respect to the due process claim, the privileges revoked by the Defendants are not "property" in a constitutional sense; and even if they are, the Rafiys have not

availed themselves of state administrative procedures to challenge the revocation of privileges, and thus cannot be heard to have been deprived of property "without due process." With respect to the Rafiys' free speech claim, the Defendants argue that the Rafiys' "speech" for which they ultimately suffered retaliation did not address matters of public concern, and therefore is not protected speech. Moreover, even if it was protected speech, the Rafiys have failed to show any retaliatory intent, either directly or circumstantially. With respect to the Rafiys' equal protection claim, the Defendants argue it should be dismissed because the Rafiys have failed to adduce evidence of an impermissible motive on the part of the Defendants, and because the incidents of which they complain are insufficiently severe or pervasive to constitute racial harassment. On all of the Rafiys' section 1983 claims, Drs. Angelo and Meinhard argue that they are entitled to qualified immunity. With respect to the Rafiys' antitrust claim, the Defendants argue that the Rafiys lack antitrust standing because they have failed to show that the Defendants' actions injured competition, as opposed merely to injury to the Rafiys as competitors.

## II. BACKGROUND

The facts recited below are taken from the Complaint ("Compl.") [Docket No. 1] and documents appended to the Rafiys' Opposition to the Defendants' Motion for Summary Judgment ("Pls.' Opp'n") [Docket No. 47], as well as the Defendants' Rule 56.1 Statement of Facts ("Defs.' Facts") [Docket No. 42] and Declaration in Support of Motion for Summary Judgment ("Epstein Decl.") [Docket No. 44], to the extent that those documents are not contradicted by the Complaint. All facts averred in the Complaint are taken to be

1. Of the District of Massachusetts, sitting by designation.

true, and all reasonable inferences from those facts are drawn in favor of the Rafiys in determining whether a reasonable factfinder could find for the Rafiys on any of their claims. As will be made clear below, however, many of the issues involved here are matters of law to be decided by the Court.

According to the Rafiys, this case is about a doctor (Meinhard) who had it in for them because they are foreigners of Persian descent who have dark skin and speak with accents. The Rafiys are both licensed physicians specializing in orthopedic surgery. Meinhard was, for most of the time relevant to this dispute, the chairman of the department of orthopedics at the Medical Center. Angelo was, at all relevant times, director of the Medical Center. Pierre Rafiy was granted privileges at the Medical Center in approximately 1970. Compl. ¶ 13. Philip Rafiy was granted privileges in August 1994. *Id.* ¶ 14. According to the Rafiys, these privileges

> entitle [them] to admit their private patients to the Hospital; they also have clinical privileges whereby they are placed on the on-call schedule of the Emergency room and orthopedic clinics where they are assigned to work with various patients who visit the hospital; thereafter plaintiffs remain the treating physicians of these patients.

*Id.* ¶ 15. Once the Rafiys' on-call and clinic privileges were revoked, they began losing access to patients and referrals of patients, which caused them a loss of income, damaged reputations, and emotional distress.

The particular incidents that led to the revocation of the Rafiys' privileges are outlined in their complaint. In July 1986, Pierre Rafiy and Meinhard got into a disagreement about the proper surgical procedure for a particular patient. Pierre Rafiy recommended that a procedure not

be performed, but Meinhard disagreed, and the procedure was performed. Compl. ¶ 19. This incident led to two letters penned by Pierre Rafiy, one to the acting chairman of the orthopedics department of the Medical Center in September 1986, the other to Meinhard in October 1986, in which Pierre Rafiy complained of this incident in particular, and of Meinhard's poor medical judgment and lack of leadership within the department in general. *Id.* ¶¶ 20–23; Pls.' Opp'n Ex. 1 (Letter from Pierre Rafiy to Frank M. Hudak ("Hudak"), Acting Chairman of the Department of Orthopedics, dated September 11, 1986); *id.* Ex. 2 (Letter from Pierre Rafiy to Meinhard, dated October 20, 1986). After these and other letters were sent by Pierre Rafiy in 1997 to Meinhard, Hudak, and the Medical Center, *see infra* p. 307 (discussing the 1997 letters), Meinhard took a number of retaliatory actions against Pierre Rafiy, including attempting to discredit Pierre Rafiy and his son in front of other doctors, instructing residents not to assist Pierre Rafiy with operations, Compl. ¶ 24–25, and ultimately removing the Rafiys from the on-call and clinic schedules in September 1998, *id.* ¶ 17.

Pierre Rafiy's son Philip Rafiy also suffered mistreatment by Meinhard. In January 1996, for instance, Philip Rafiy arrived at the Medical Center to find that a patient upon whom he was scheduled to operate had been transferred to another doctor, Dr. Leone ("Leone"), who was a private practice partner of Meinhard. Compl. ¶ 28. In response to the dispute between Rafiy and Leone, Meinhard told Rafiy that "he would be willing to forget about the matter if Dr. Philip Rafiy agreed to leave the hospital." *Id.* ¶ 30. Philip Rafiy refused Meinhard's offer. As a result, according to the Rafiys, a Risk Committee at the Medical Center was convened to evaluate Philip Rafiy's proposed

treatment of the reassigned patient, and concluded that such treatment did not meet the appropriate standard of care. Thereafter, Philip Rafiy was not allowed to conduct spinal surgery without being supervised by another orthopedic surgeon, and was relieved from teaching duties until the monitoring restrictions were lifted. *Id.* ¶ 33. Philip Rafiy requested a hearing pursuant to Medical Center rules to challenge this restriction on his practice. *Id.* ¶ 35. According to Philip Rafiy, "[i]t was subsequently determined through an impartial consultant Dr. Philip Rafiy had met the standard of care with respect to the treatment of this patient." *Id.* ¶ 36. In response to this incident, Philip Rafiy fired off an angry letter to Meinhard on July 14, 1996. Pls.' Opp'n Ex. 3 (Letter from Pierre Rafiy to Meinhard, dated July 14, 1996). In September 1998, Philip Rafiy's on-call and clinical privileges were revoked. Compl. ¶ 17. He wrote a letter to Meinhard and Angelo requesting an explanation for the revocation, but was told only that his services were no longer needed. *Id.* ¶¶ 38–39.

According to the Rafiys, Meinhard discriminated against them on the basis of race and national origin. In their view, Meinhard did not treat other similarly-situated physicians the same way he treated them. Meinhard repeatedly said things like "you foreigners come here and have big houses and country clubs," *id.* ¶ 52, that the Medical Center "is not for you, it is for American born people," *id.* ¶ 53, that Pierre Rafiy's foreign accent was not worthy of practicing in a University-affiliated teaching center, *id.*, and that the Rafiys' country of origin was "ignorant and backwards," *id.*

Not surprisingly, the Defendants tell a very different version of events. To the Defendants, this case is about two substandard and highly unprofessional doctors with respect to whom the Defendants exercised lawful discretion vested in them to take away but a fraction of the privileges those doctors enjoyed at the Medical Center. Indeed, the Defendants do not even consider the on-call and clinic schedules from which the Rafiys were removed to be "privileges" as that term in defined by state law and the hospital bylaws. *See infra* Part III.A.1.a. According to the Defendants, the Rafiys engaged in a host of unprofessional and careless activity that caused Meinhard to remove them from the on-call and clinic schedules. With respect to Pierre Rafiy, the Defendants assert that he:

(i) badgered patients for insurance information and payments, often harassing patients at their homes, notwithstanding hospital policy to treat patients regardless of ability to pay;

(ii) undertook surgical procedures for which he was unqualified or unprepared to perform, depending entirely on medical residents to prepare for and perform the surgeries, and in some instances, failing to seek a consultation and support in certain difficult areas;

(iii) failed to follow up with patients after surgeries, anticipate complications, and take preventive measures to avoid conditions from worsening;

(iv) disrupted of [sic] the orthopedic office and its administrative activities, violated patients' confidentiality, and altered records;

(v) arrived at the orthopedic clinic late and left early;

(vi) skimmed patients' charts for insurance information, pushing patients with Workers Compensation insurance or its equivalent for surgery with the residents, while not making such efforts with similar patients without insurance.

Defs.' Facts ¶ 70. With respect to Philip Rafiy, the Defendants aver that he:

(i) failed to properly take care of patients;

(ii) failed to accept a patient and transfer a patient upon whom he had performed surgery when a complication developed;

(iii) engaged in a pattern of deceitful chart entries on patients' charts;

(iv) arrived late and left early at [the] clinic;

(v) tailored treatment to the patients' insurance status.

*Id.* ¶ 121. Most of the Defendants' Statement of Material Facts is devoted to elaborating upon and providing examples of these concerns about the Rafiys' ability and willingness to provide medical services to patients at the Medical Center. *See id.* ¶¶ 71–118, 122–39.

The Defendants attribute significance to the fact that the Rafiys were "voluntary" attending physicians at the hospital, as opposed to "salaried" or "sessional" attending physicians. *Id.* ¶ 29–32. This means that, instead of being paid a set salary per year (salaried) or per term (sessionals), they were paid on a per-procedure or per-consultation basis. *Id.* ¶ 34. They could only encounter patients to perform these procedures and consultations for which they could bill when they performed a consultation at the request of the attending physician, or served as the attending physician of record when the patient is first brought in (to the emergency room, for example), or performed a procedure for a patient on an in-patient or outpatient basis. *Id.* ¶ 38. In the Defendants' view, the Rafiys' status as voluntary attending surgeons is significant because it means that the director of any department within the Medical Center (such as Meinhard) has broad discretion to grant or deny certain privileges to applicants for

such privileges. In the *Policy/Procedure* manual of the Medical Center, it states that "[t]he Department Chair will send the applicant a request for privileges form that is hospital specific and department specific. The applicant will check off the privileges requested. The Department Chair will review the request and check off the privileges granted." Epstein Decl.Ex. H, § 4.2. The orthopedics department has a delineation of privileges form, but nowhere does it mention "on-call" or clinic teaching responsibilities. *See id.* Exs. J, K (forms for Drs. Pierre and Philip Rafiy); Defs.' Facts ¶ 58. Instead, the form delineates particular types of procedures, such as wrist reconstruction or spinal trauma procedures. *See* Epstein Decl.Exs. J, K. Any physician denied requested privileges by a department chair may appeal the denial of privileges to the Executive Committee of the Medical Staff of the Medical Center. Defs.' Facts ¶ 54.

In response to the factual allegations made by the Rafiys in their complaint, the Defendants respond with a number of citations to the factual record that, in their view, refute many of the Rafiys' claims. For instance, according to the Defendants, the Rafiys conceded during their depositions that they never heard anyone at the Medical Center make a joke or comment about their national origin, ethnic background, skin color, or foreign accent. Epstein Decl.Ex. C, at 182–84, 187–90 (Deposition of Pierre Rafiy); *id.* Ex. D, at 4–5 (Deposition of Philip Rafiy). Instead, Pierre Rafiy learned of racial and ethnic comments allegedly made by Meinhard through a medical resident, Dr. Messirian. *Id.* Ex. C, at 182–86.[2] Neither Rafiy nor Messirian ever reported these comments to anyone else. Defs.' Facts ¶ 142. Pierre

---

**2.** To date, the Rafiys have not submitted an affidavit from Dr. Messirian confirming that these statements were uttered, nor have they

secured his availability to testify at trial. *See* Pls.' Opp'n at 18.

Rafiy also acknowledged that he never personally heard Meinhard make a joke or comment about anyone's heritage, ethnic background, or foreign accent. Epstein Decl.Ex. C, at 188–90.

One incident that led Philip Rafiy to believe he was the victim of discrimination on the basis of race was the Medical Center's decision to place him under supervision for all future spinal operations after a disagreement between Philip Rafiy and Meinhard about the proper course of care for a particular patient. *See supra* pp. 298–99 (discussing the incident). According to the Defendants, the condition of the patient worsened significantly after Philip Rafiy performed an operation on her spine. Philip Rafiy then left to go on vacation, at which point he assigned the case to his father, who did not have privileges to perform spine operations. Defs.' Facts ¶¶ 163–64. According to Meinhard, when the patient's condition worsened, the family, who spoke Italian, requested a doctor who also spoke Italian and who had operated on a friend or relative of the family, Dr. Leone. *Id.* ¶ 165. Dr. Leone operated and the patient recovered. *Id.* ¶ 166. Under New York law, when there is an unplanned return to the operating room within 30 days of surgery (as there was here after Philip Rafiy operated), Meinhard was required to determine whether the standard of care was met with respect to the original procedure. This required Meinhard to interview Philip Rafiy and Leone, who disagreed about whether Rafiy had satisfied the standard of care. Although Meinhard and the Risk Committee of the Medical Center were unable to reach a conclusion about whether the standard of care was met with respect to Rafiy's operation, Meinhard placed Philip Rafiy under supervision for all future spinal procedures until the results of an investigation by an outside reviewer were obtained. *Id.* ¶ 170. Once the outside reviewer determined that Philip Rafiy had

satisfied the standard of care in the case, Meinhard lifted the monitoring restriction, and allowed Rafiy to perform spinal surgery without a monitor. *Id.* ¶ 171. Philip Rafiy conceded at his deposition that the reassignment of the case to Dr. Leone was not made on the basis of Rafiy's national origin, ethnicity, or skin color. Epstein Decl.Ex. D, at 23–24.

Another instance of alleged discrimination came when Meinhard allegedly denied Philip Rafiy reappointment as an attending physician at the Medical Center in 1999. The Defendants assert that this happened only because Philip Rafiy failed to initial the Delineation of Privileges form required for reappointment. When asked to do so by a hospital administrator and the chairman of the credentialing committee, Philip Rafiy responded with an angry letter complaining of Dr. Meinhard's "vendetta" against him. Defs.' Facts ¶¶ 178–79, 181; Epstein Decl.Ex. N. Philip Rafiy conceded at his deposition, however, that he was not asked to initial the form because of his race or national origin, and that all physicians in the department of orthopedics were required to initial the form. *Id.* Ex. D, at 219–20.

> Ultimately, the Defendants contend that Drs. Pierre Rafiy and Philip Rafiy were removed from the on-call and clinic schedules at the same time because they covered for each other and they provided inadequate coverage, their teaching and on-call responsibilities were not being met, and Dr. Angelo had sufficient information concerning problems regarding both doctors whereby the decision affecting both doctors was appropriate administratively.

Defs.' Facts ¶ 186. They make clear, however, that neither doctor was prohibited from practicing medicine or performing surgery at the Medical Center. Rather, Pierre Rafiy "was reappointed as a volun-

tary attending physician at ... [the Medical Center] in July 1999, which appointment was for two years, except he no longer had on-call duties or teaching responsibilities at the clinic." *Id.* ¶ 187. Pierre Rafiy stopped performing surgeries after he was removed from the on-call and clinic schedules, however, "because he canceled his malpractice insurance, and instead referred surgeries to his son...." *Id.* ¶ 194.

## III. DISCUSSION

The factual exposition above suggests that the parties differ wildly over why Meinhard and the other Defendants took the actions they did with respect to the Rafiys. This might suggest that summary judgment is inappropriate for much of the Rafiys' complaint. As the Defendants point out, however, many of the issues raised in the Rafiys' complaint are matters of law, to be resolved by this Court instead of a jury. These issues are discussed below. Where the issue is a factual one, this Memorandum assays the record to determine whether a genuine dispute exists with respect to the factual issue.

### A. Section 1983 Claims (Counts One, Two, and Three)

#### 1. *Procedural Due Process Violation (Count One)*

Count One of the Rafiys' complaint alleges that the Defendants deprived them of on-call and clinic privileges "without a hearing despite the fact that such a hearing is required." Compl. ¶ 46. Particularly, the Rafiys complain of the fact that the Defendants failed to follow the procedures outlined in Articles VII and VIII of the Medical Center bylaws, *see* Epstein Decl. Ex. G, at 9–20, which would entitle the Rafiys to a hearing and review by the Executive Committee of the Medical Center, and appeal to the Board of Managers. Compl. ¶ 46. According to the Rafiys, no pre- or post-deprivation hearing was ever held on the Defendants' decision to reduce the privileges available to the Rafiys.

The Defendants respond in two ways. First, they argue that the on-call and clinic assignments that were revoked by the Defendants are not protected property under the Due Process Clause of the Fourteenth Amendment, not because hospital privileges are not protected property—they are, as the Defendants concede, Defs.' Mem. at 7, and as the Second Circuit has declared, *Greenwood v. New York, Office of Mental Health,* 163 F.3d 119, 122 (2d Cir.1998)—but because being placed on the on-call and clinic schedules are not "hospital privileges" as that phrase is defined by New York law (statutory and regulatory) and the Medical Center's bylaws and *Policy/Procedures* manual. Defs.' Mem. at 7–11. Second, they argue that even if these two aspects of practice at the Medical Center constitute protected property interests, the Rafiys failed to pursue post-deprivation remedies available to them under New York law. They are therefore not in a position to argue that available state law remedies are inadequate to remedy the deprivation, as is required to prevail on a section 1983 claim predicated upon violation of procedural due process. *Id.* at 11–13. Both of these issues are matters of law, which the Court may decide. *See Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999) (existence *vel non* of property interest is matter of law); *Gudema v. Nassau County,* 163 F.3d 717, 724 (2d Cir.1998) (adequacy of state law remedies is matter of law).

##### a. Existence of a Property Interest

The Defendants argue that on-call and clinic assignments are not hospital privileges, and therefore not protected property interests under the Due Process Clause of the Fourteenth Amendment. To determine whether a property interest exists, courts often look to state law. *E.g., Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct.

2701, 33 L.Ed.2d 548 (1972). In the Second Circuit, the test is whether the claimant has a "clear entitlement" to the property he is seeking, which usually turns on "whether the issuing authority lacks discretion to deny the entitlement [property interest], i.e., is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met." *Natale*, 170 F.3d at 263. "If the statute, regulation or contract in issue vests in the ... [decisionmaker] significant discretion over the continued conferral of that benefit, it will be the rare case that the recipient will be able to establish an entitlement to that benefit." *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 175 (2d Cir.1991).

Although New York law does not define what constitutes a hospital privilege, New York regulations do require that a hospital delineate privileges available to physicians in writing. N.Y.Comp.Codes R. & Regs. tit. 10, ¶ 405.2(e)(3) (requiring hospital governing boards to "ensure the implementation of written criteria ... for the delineation of their medical privileges."). The Medical Center has put such criteria in writing, but it is clear from that writing that the only privileges granted are for specific types of procedures, such as spinal trauma surgery, wrist reconstruction, and the like. *See* Epstein Decl.Exs. J, K (delineation of privileges for the Rafiys). A doctor, at least at the Medical Center, may not apply for a hospital privilege to be assigned to the on-call schedule or to work in an outpatient clinic.

■ In New York, then, whether a particular feature or perquisite of medical practice at a hospital rises to the level of a constitutionally protected property interest under the Due Process Clause depends on whether a particular hospital chooses to put that feature in writing as part of its state-mandated delineation of privileges. Absent such a written delineation, a physician cannot be said to have a "clear entitlement" to be placed within a particular area or unit of the hospital. *See, e.g., Clarke v. City of New York*, No. 98–CV–3715 (ILG), 2001 WL 876926, at *9 (E.D.N.Y. Aug.1, 2001) (Glasser, J.) (ruling that a physician had no property interest in assignment to emergency room where the physician could point to "no state law or provision of a collective bargaining agreement which would give him even a colorable property interest in a particular department" at a hospital); *Hanna v. Bd. of Trustees*, 243 A.D.2d 362, 362, 663 N.Y.S.2d 180 (1st Dep't 1997) (holding that there was no property interest in title as chief of pediatric urology or in reserved operating room time, because neither constituted "professional privileges").

■ Because the Medical Center's written delineation of hospital privileges is limited to particular types of procedures, and does not delineate access to certain parts of the hospital, or to certain schedules or rotations as some of the host of privileges for which a physician may apply, the employment actions taken against the Rafiys do not amount to a deprivation of a recognized property interest sufficient to support a federal constitutional claim under the Fourteenth Amendment. Whether the Medical Center allowed the Rafiys as voluntary attending physicians to practice in certain parts of the hospital was left up to the discretion of the hospital's decisionmakers, which undermines the Rafiys' position that placements on certain rotations or schedules are enforceable constitutional property interests. *See Kelly Kare, Ltd.*, 930 F.2d at 175.[3]

---

3. It seems to this Court that there may be aspects of "professional privileges" that must be considered privileges, even though not enumerated in writing at a particular hospital, because without such unenumerated features of medical practice physicians would be unable to perform those features of practice that are enumerated. For instance, surely in

### b. Adequacy of State Procedures

■ Even if the on-call and clinic rotations were privileges protected by the Constitution, which the Court rejects, it is also apparent that the Rafiys failed to seek redress of their grievances under state law. To be sure, the hospital never conducted hearings pursuant to its bylaws to review Meinhard's decision to remove the Rafiys from the on-call and clinic schedules, *see* Compl. ¶ 46 (arguing that such a hearing should have taken place). This does not change the fact, however, that the Rafiys had two options they could have pursued in order to seek review of Meinhard's decision. First, they could have complained to the New York Public Health Council about the decision under the New York Public Health Law, which makes it unlawful for a hospital governing body to "curtail, terminate or diminish in any way a physician's ... professional privileges in a hospital, without stating the reasons therefor, or [to diminish the physician's privileges] if the reasons stated are unrelated to standards of patient care, patient welfare, the objectives of the institution or the character or competency of the applicant." N.Y.Pub. Health Law § 2801–b(2). Second, they could have proceeded under Article 78 of the New York Civil Practice Law, which allows aggrieved doctors to challenge the failure by a hospital to comply with its own bylaws (which the Rafiys allege here, *see* Compl. ¶ 46), *see, e.g., Saha v. Record,* 177 A.D.2d 763, 764–65, 575 N.Y.S.2d 986 (3d Dep't 1991). The record is undisputed that the Rafiys did not pursue either procedure, Defs.' Mem. at 12, 13, but instead jumped immediately from intra-hospital proceedings into federal court.

The Defendants argue that, because the Rafiys have not pursued either of these state law options, they cannot argue that state law remedies are inadequate, which is an essential component of a procedural due process claim. Defs.' Mem. at 11–13. The Court agrees. In *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), the Supreme Court observed that, with respect to claims of procedural due process violations, "[t]he constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the state fails to provide due process." *Id.* at 126, 110 S.Ct. 975; *see also Parratt v. Taylor,* 451 U.S. 527, 543, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled on other grounds by *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 880 (2d Cir.1996) ("[T]he Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful postdeprivation remedy."). Because the Rafiys have not alleged that state law procedures were inadequate, but only that Meinhard and others failed to follow such procedures, the Rafiys cannot make out a due process violation in this case.[4]

addition to performing certain surgical procedures—the only enumerated privileges here— privileges might include the right to use operating rooms, the right to use nursing and anesthesiologic staff, the right to use hospital computer systems for storing patient data, and the like. As these are not enumerated, but nevertheless seem to be essential constituent components of privileges, the reasonable conclusion is that the enumerated definition is not the sole extent of privileges. The Court declines to deviate from established New York analysis, however, as New York state courts are surely more competent to decide what constitutes hospital privileges in New York than this Court. Moreover, as the Court holds that the post-deprivation grievance procedures available to the Rafiys comport with due process requirements, the Court need not.

4. The Rafiys apparently try to skirt the issue of available state law post-deprivation remedies by stating that "[t]his determination to withdraw plaintiff's clinical privileges was not

## 2. *Discrimination and Racial Harassment (Count Two)*

▮ The Rafiys also complain that Meinhard treated them differently than other similarly-situated physicians, and subjected them to racial harassment.

With respect to the selective enforcement claim, the Rafiys must first identify a group of similarly-situated individuals relative to whom they were treated unfairly. *LaTrieste Restaurant & Cabaret, Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir.1994); *Payne v. Huntington Union Free Sch. Dist.*, 219 F.Supp.2d 273, 278–81 (E.D.N.Y.2002). Perhaps the "similarly situated" group would be other doctors within the department of orthopedics who are not of Persian descent, *see* Compl. ¶ 54, or who are not foreigners. The record reflects, however, that the Rafiys accuse Meinhard of extending special treatment to a doctor, Dr. Cashin, who like the Rafiys is of Persian descent. Defs.' Facts ¶ 149. Moreover, the Rafiys conceded at deposition that other doctors were removed from the on-call and clinic schedules against their will. Epstein Decl.Ex. C (Pierre Rafiy Deposition). The Rafiys have failed to marshal evidence tending to show that they were singled out on the basis of their race, skin color, or country of origin, and subjected to unequal treatment on that basis.

With respect to the racial harassment claim, the Rafiys have not, as matter of undisputed fact, established the kind of severe and pervasive harassment that would entitle them to relief under the Equal Protection Clause. First, the Rafiys conceded at deposition that they never personally heard anyone at the Medical Center make any joke or comment about their national origin, race, skin color, or accent. Epstein Decl.Ex. C, at 182–84, 187–90; *id.* Ex. D, at 4–5. While they claim to have heard about several remarks made by Meinhard through a resident, Dr. Messirian, *see supra* p. 300, the Rafiys have not submitted an affidavit from Dr. Messirian or even secured his availability to testify at trial, *see supra* note 2. At the moment, then, the entire factual basis for the Rafiys' discrimination claim is hearsay, which alone is insufficient to survive summary judgment. *E.g., Albert v. Loksen*, 239 F.3d 256, 266–67 (2d Cir.2001).[5]

---

random or unauthorized, but was a deliberate decision made by Drs. Meinhard and Angelo." Compl. ¶ 43. This statement is significant, for the Second Circuit has recognized a distinction between random or unauthorized deprivations of liberty or property by state officials, for which the adequacy of state post-deprivation remedies is the dispositive factor, *Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 880, and deprivations that occur "in the more structured environment of established state procedures, rather than random acts," i.e., complaints regarding the state procedure itself, for which "the availability of postdeprivation procedures will not, ipso facto, satisfy due process," *id.* The Rafiys attempt to characterize their claim as falling into the second category, thus freeing them from the need to seek relief under or demonstrate the inadequacy of state law procedures.

It is clear from the Rafiys' complaint, however, that their grievance is with the Defendants' failure to hold hearings under the bylaws, not with the state procedures themselves. Compl. ¶¶ 46, 48. *See Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 881 (reaching the same conclusion with respect to the plaintiff in that case, because there the plaintiff "ma[de] no claim that the due process violation was caused by an established state procedure, such as the City Charter," but instead argued that "state officials acted in flagrant violation of the City Charter"). Here, because the Rafiys' complaint is really about the random and unauthorized actions of Dr. Meinhard, the availability of state law post-deprivation remedies, and the failure by the Rafiys to avail themselves of such remedies, lead this Court to conclude that the Rafiys have no viable procedural due process claim.

5. The Rafiys concede that if they are unable to secure Dr. Messirian's presence at trial, this

Even if the Rafiys succeed in securing the testimony of Dr. Messirian, however, it is clear that the statements allegedly made by Meinhard to him were too isolated and insubstantial to make out a constitutional claim, however crude and insensitive they may have been. The Supreme Court has stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). As the Second Circuit has stated, "instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments" to make out a claim for racial harassment. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). Against this exacting standard, designed to ensure that hurt feelings and episodes of insensitivity do not become federal constitutional cases, the Rafiys' allegations, even if true, do not make out a claim for racial harassment.

### 3. *Retaliation Against Exercises of Free Speech (Count Three)*

The Rafiys next argue that the Defendants retaliated against them for exercising free speech rights, particularly with respect to a number of letters sent by the Rafiys to various members of the Medical Center, in which they criticized Meinhard's administration of the department of orthopedics. Defs.' Mem. at 15.

■ There are three elements of a cause of action for retaliation in violation the First Amendment: (1) the speech or conduct must be protected; (2) the defendant must have taken adverse action against the plaintiff; and (3) there must be a causal connection between the protected speech and the adverse action. *Garcia v. SUNY Health Sciences Ctr.*, 280 F.3d 98, 106–07 (2d Cir.2001). With respect to the first element, speech is protected only if it is a matter of public concern.[6] Whether speech is a matter of public concern is matter of law, to be decided by the Court. *Connick v. Myers*, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

■ A "matter of public concern" has been defined by the Supreme Court as "relating to any matter of political, social, or other concern to the community...." *Id.* at 146, 103 S.Ct. 1684. While this capacious definition would appear to comprise complaints about the leadership and competence of the head of a hospital department of a hospital from within, the Supreme Court was careful in *Connick* to note that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147, 103 S.Ct. 1684. In other words, where the speech uttered by the employee relates simply to a disagreement or a criti-

---

claim would not be viable, and would likely be withdrawn. Pls.' Opp'n at 18. This convinces the Court that the testimony of Dr. Messirian forms the entire basis upon which the Rafiys' discrimination claims rests.

**6.** The parties do not contest that the Rafiys are government employees—employees of the

county hospital. *See Ezekwo v. New York City Health & Hosp. Corp.*, 940 F.2d 775 (2d Cir. 1991) (medical resident at Harlem Health Center a public employee). Accordingly, the public concern doctrine is applicable to the Rafiys' claim.

cism of the employer as a boss, it is unlikely that such speech will be protected.

This is true even though, at a hospital, concerns about the competence or skill of a hospital administrator would presumably be of some interest to the public at large, particularly prospective consumers of the medical services provided by the criticized physician. In a case factually similar to this one, the Second Circuit held that the speech uttered did not touch upon a matter of public concern. *Ezekwo v. New York City Health & Hosp. Corp.*, 940 F.2d 775 (2d Cir.1991). In *Ezekwo*, a doctor sued when she was denied appointment to the position of chief resident of the ophthalmology department at a hospital, in her view because she had previously complained about the director of the residency program on numerous occasions. In her complaints, the aggrieved doctor criticized the director in a number of ways, impugning the director's skill as a doctor, teacher, and administrator. *Id.* at 777–78. The Second Circuit rejected her claim for retaliation in violation of the First Amendment, stating that

> [v]iewed objectively and as a whole, Ezekwo's statements did not address matters of public concern. Her complaints were personal in nature and generally related to her own situation within the ... [hospital] residency program.... Ezekwo was not on a mission to protect the public welfare. Rather, her primary aim was to protect her own reputation and individual development as a doctor.

*Id.* at 781.

Having reviewed the letters penned by the Rafiys to various members of the Medical Center, this Court is persuaded that the speech found therein, like the speech found in the letters written by the plaintiff in *Ezekwo*, is not protected. To be sure, some of the letters written by the Rafiys touch upon Meinhard's skills as a doctor and a hospital administrator. When read in context, however, these letters were meant only by the Rafiys to defend their personal reputations against claims that they failed to meet the standard of care in particular instances, or to complain about what they believed were unfair practices by Meinhard as a competitor in referring patients to his own practice partners, rather than to the Rafiys or other doctors.

In a letter dated September 11, 1986, for instance, Pierre Rafiy wrote to the then-chairman of the department of orthopedics, Frank M. Hudak, to defend himself in a dispute between him and Meinhard over the proper course of action with respect to the care of a patient for which the ultimate responsibility rested with Rafiy. Pls.' Opp'n Ex. 1. A letter Rafiy wrote one month later to Meinhard appears to be a defense to Meinhard's allegation that Rafiy was supposed to be on call on a day when Rafiy believed he was not so obligated; it also appears to be a complaint about the way in which Meinhard handled the incident. *Id.* Ex. 2. The Rafiys did not send any other letters until July 14, 1996, when Philip Rafiy wrote to Meinhard to complain of Meinhard's decision to place Rafiy under supervision for all future spinal procedures until an independent investigation of Rafiy's handling of a previous spine operation that met with bad results was completed. *See supra* pp. 298–99. Philip Rafiy complained of the continuing supervision in light of the fact that the independent investigation had concluded that he had met the standard of care, and of the fact that practice partners of Meinhard was not similarly investigated when allegations of negligence arose. Pls.' Opp'n Ex. 3. Another letter written by Philip Rafiy on May 13, 1999, expresses his (perhaps reasonable) exasperation that his application for privileges at the Medical Center would not be processed until he initialed the final page of the application, even though he had signed the same page. Ep-

stein Decl.Ex. N. Philip Rafiy used this letter as an occasion to decry Meinhard's "personal vendetta" against his practice. *Id.*

The two letters that come the closest to touching upon matters of public concern were written by Pierre Rafiy in July and August 1997. In the July letter, Pierre Rafiy urged the Medical Center's Board of Managers to decline to re-appoint Meinhard to the position of chairman of the department of orthopedics, citing concerns with Meinhard's "professional conduct, morality, ethics, and attitude." *Id.* Ex. P. Most of the July letter, however, is devoted to Rafiy's complaint that Meinhard favored practice partners over other doctors in referring patients. The letter also contains anecdotes about Meinhard's failure to perform the proper procedure with respect to certain patients, and about Meinhard's management (or mismanagement, in Rafiy's view), of the department of orthopedics. The letter concludes with Rafiy's suggestion that he, his son, or one of several other doctors named by him take Meinhard's place as chairman of the department. *Id.* The August letter, also written by Pierre Rafiy, complains of Meinhard's alleged harassment of Rafiy on the basis of national origin, which according to Rafiy undermined the relationship between the two doctors. *Id.* Ex. Q.

When the Rafiys' statements are examined in the context of the record as a whole, as they must be, *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684, it is clear that the statements do not touch upon matters of public concern, but instead concern a personal and acrimonious dispute between the Rafiys and Meinhard over how and to what extent the Rafiys were to practice medicine at the Medical Center. Even if

the Rafiys' letters contain language giving them the appearance of seeking to protect the public against poor medical care provided by a doctor, it is plain that the statements were motivated by the Rafiys' desire to defend themselves and to take the offensive in a personnel dispute with another doctor. Such statements are not protected by the First Amendment. *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994) ("[T]he fact that an employee's speech touches on matters of public concern will not render that speech protected where the employee's motive for the speech is private and personal.").

■ Furthermore, even if the statements contained in the Rafiys' letters touched upon matters of public concern, the Rafiys have failed to show that the Medical Center took the adverse employment action it did against the Rafiys because of the protected speech, and therefore have not satisfied the third element of a retaliation claim, causation. *Garcia*, 280 F.3d at 106–07. Here, the adverse action complained of by the Rafiys took place in September 1998, Compl. ¶ 17, over one year after the last relevant letter was sent by Pierre Rafiy to Meinhard on August 24, 1997. Epstein Decl.Ex. Q.[7] As the Defendants point out, other decisions within the Second Circuit have pointed to time lapses of over a year between the protected speech and the adverse action as evidence that the defendant did not retaliate against the plaintiff for engaging in protected speech. *E.g., Garcia*, 280 F.3d at 107 (attributing significance to the fact that "some thirteen months passed between the date of the letter and his [the plaintiff's] dismissal"); *Clarke*, 2001 WL 876926, at *7 (ruling that a time lapse of six months to

---

7. The May 13, 1999 letter from Philip Rafiy to the Medical Center complaining of Meinhard's "personal vendetta" against him, Epstein Decl.Ex. N; *see supra* p. 306 (describing the letter), was written after the allegedly adverse action—removal from the on-call and clinical schedules—was taken, and thus is not relevant to the question of causation.

two years meant that no causal connection could be established); *Bayard v. Riccitelli,* 952 F.Supp. 977, 987 (E.D.N.Y.1997) (Nickerson, J.) (holding that a one-year lapse was too long to support an inference of retaliation).

For these reasons, the Rafiys' retaliation claim fails to survive summary judgment.

### 4. *Qualified Immunity*

Defendants also argue that Meinhard and Angelo are entitled to qualified immunity on all Section 1983–based claims (Counts One through Three). Because all of the Rafiys' claims based on Section 1983 fail summary judgment on the merits with respect to *all* of the Defendants, however, the Court finds it unnecessary to reach the issue of qualified immunity. *See Payne,* —— F.Supp.2d at ——, slip op. at 28, 2002 WL 31039460 (declining to decide the issue of qualified immunity after ruling that no constitutional violation had taken place).

### B. Sherman Act Claim (Count Four)

Originally, the Rafiys attempted to make out an antitrust violation by arguing that Meinhard's actions, including "transferring plaintiff's patients to Meinhard's private medical partner, giving priority to [Meinhard's private partners] concerning on-call schedules and clinics, and referring patients to the [partners of Meinhard], demonstrate defendant Meinhard's predatory and anti-competitive conduct with specific intent to monopolize the orthopedic market." Compl. ¶ 66. The Rafiys have withdrawn this claim, however, Pls.' Opp'n at 2, so the Court need not consider it.

### IV. CONCLUSION

For the reasons outlined above, the Defendants' motion for summary judgment [Docket No. 41] is ALLOWED. Judgment shall enter for the Defendants on all counts of the Complaint.

SO ORDERED.